(Slip Opinion) OCTOBER TERM, 2025 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LOUISIANA *v.* CALLAIS ET AL.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF LOUISIANA

No. 24–109.   Argued October 15, 2025—Decided April 29, 2026[*]

These cases concern whether Louisiana's new congressional map is an unconstitutional racial gerrymander. In 2022, after the State redrew its congressional districts, a federal judge in *Robinson* v. *Ardoin*, 605 F. Supp. 3d 759 (MD La.), held that the 2022 map likely violated §2 of the Voting Rights Act of 1965, 52 U. S. C. §10301 *et seq.*, because it did not include an additional majority-black district. But when the State drew a new map, SB8, that contained such a district, the new map was challenged as a racial gerrymander. A three-judge court in *Callais* v. *Landry*, 732 F. Supp. 3d 574 (WD La.), held that SB8 violated the Equal Protection Clause of the Fourteenth Amendment, and the State appealed to this Court.

   The parties originally briefed and argued this suit last Term, and their arguments at that time highlighted problems in the existing body of §2 case law. One problem resulted from the rule that in racial gerrymandering cases, unlike other cases involving claims of racial discrimination, strict scrutiny is triggered only if race "predominated" in the State's decisionmaking process. Another problem stemmed from the long-unresolved question whether compliance with the Voting Rights Act provides a compelling reason that may justify the intentional use of race in drawing legislative districts. For over 30 years, the Court has simply assumed for the sake of argument that the answer is yes. These and other problems convinced the Court that the time had come to resolve whether compliance with the Voting Rights Act can indeed provide a compelling reason for race-based districting.

_____

*Together with No. 24–110, *Robinson et al.* v. *Callais et al.*, on appeal from the same court.

*Held*:  Because the Voting Rights Act did not require Louisiana to create
    an additional majority-minority district, no compelling interest justi-
    fied the State's use of race in creating SB8, and that map is an uncon-
    stitutional racial gerrymander.  Pp. 17–36.

    (a) The Constitution almost never permits a State to discriminate on
    the basis of race, and such discrimination triggers strict scrutiny.  The
    Court's precedents have identified "only two compelling interests" that
    can satisfy strict scrutiny: "avoiding imminent and serious risks to hu-
    man safety in prisons," and "remediating specific, identified instances
    of past discrimination that violated the Constitution or a statute." *Stu-*
    *dents for Fair Admissions, Inc.* v. *President and Fellows of Harvard*
    *College*, 600 U. S. 181.  The question presented is whether compliance
    with §2 of the Voting Rights Act should be added to this very short list
    of compelling interests.  The Court now holds that compliance with §2,
    *as properly construed*, can provide such an interest.  A proper interpre-
    tation of §2 requires examining the statutory text to understand what
    it demands with respect to drawing legislative districts.  Pp. 17–26.

        (1) Under Section 2(a), the Court takes as a given that a legislative
    districting map may constitute a "standard, practice, or procedure"
    that may violate §2 if it "results in a denial or abridgement" of the right
    to vote "on account of race or color."  Section 2(b) establishes that a
    violation occurs when political processes are "not equally open to par-
    ticipation by" members of a racial group "in that [they] have less op-
    portunity than other members of the electorate to . . . elect represent-
    atives of their choice."  The key concept is "less opportunity than other
    members of the electorate," which sets a baseline against which to as-
    sess the opportunity of minority voters.  That baseline—the oppor-
    tunity that any given group of voters has to elect their candidate of
    choice—depends on the voting preferences of other voters in the dis-
    trict.  For example, in a district where most voters prefer Democratic
    candidates, a Republican voter in that district will have a low chance
    of securing the election of his or her preferred candidate.  The roster of
    voters who end up in a given district depends, in turn, on the district-
    ing criteria the State uses to draw a legislative map.  Thus, the "oppor-
    tunity" of these "members of the electorate" to contribute their votes to
    a winning cause is whatever opportunity results from the application
    of the State's combination of permissible districting criteria.  That is
    what a randomly selected individual voter and group of voters can ex-
    pect regarding their opportunity to elect their preferred candidate.
    Under §2, a minority voter is entitled to nothing less and nothing more.
    Pp. 19–22.

        (2) This interpretation is the best reading of the statutory text and
    ensures that §2 of the Voting Rights Act does not exceed Congress's
    authority under §2 of the Fifteenth Amendment, which confers on

Syllabus

Congress the "power to enforce [the Amendment] by appropriate legislation."  As the Court has long held, the Fifteenth Amendment bars only state action "'motivated by discriminatory purpose.'"  *Reno* v. *Bossier Parrish School Bd.*, 520 U. S. 471, 481.  So a law that seeks to enforce the Fifteenth Amendment by prohibiting mere disparate impact would fail to enforce a right that the Amendment secures.  That is never "appropriate," *South Carolina* v. *Katzenbach*, 383 U. S. 301, 308, because Congress cannot "enforce a constitutional right by changing what the right is," *City of Boerne* v. *Flores*, 521 U. S. 507, 519.  For this reason, the focus of §2 must be enforcement of the Fifteenth Amendment's prohibition on *intentional* racial discrimination.  When §2 of the Act is properly interpreted, it imposes liability only when circumstances give rise to a strong inference that intentional discrimination occurred.  Properly understood, §2 thus does not intrude on States' prerogative to draw districts based on nonracial factors, including to achieve partisan advantage.  In short, §2 imposes liability only when the evidence supports a strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race.  Not only does this interpretation follow from the plain text of §2, but it is consistent with the limited authority that the Fifteenth Amendment confers.  Pp. 22–26.

(b) This interpretation does not require abandonment of the framework for evaluating §2 claims that the Court established in *Thornburg* v. *Gingles*, 478 U. S. 30.  The Court need only update the framework so it aligns with the statutory text and reflects important developments since the Court decided *Gingles* 40 years ago.  Four historical developments are of particular note.  First, vast social change has occurred throughout the country and particularly in the South, which have made great strides in ending entrenched racial discrimination.  Second, a full-blown two-party system has emerged in the States where §2 suits are most common, and there is frequently a correlation between race and party preference.  Third, in *Rucho* v. *Common Cause*, 588 U. S. 684, this Court held that partisan gerrymandering claims are not justiciable in federal court, and this holding creates an incentive for litigants to exploit §2 for partisan purposes by "repackag[ing] a partisan-gerrymandering claim as a racial-gerrymandering claim," *Alexander* v. *South Carolina State Conference of the NAACP*, 602 U. S. 1, 21.  Fourth, the increased use and capabilities of computers in drawing districts and creating illustrative maps means that a §2 plaintiff can easily identify an alternative map that fully achieves all the State's legitimate goals while producing greater racial balance, if such a map is possible.  In light of these developments, the Court updates the *Gingles* framework and realigns it with the text of §2 and constitutional principles.  Pp. 26–31.

Syllabus

(1) The first *Gingles* precondition is that a community of minority voters must be sufficiently numerous and compact to constitute a majority in a reasonably configured district. While many §2 plaintiffs have simply provided illustrative maps with their desired number of majority-minority districts, such maps prove only that the State *could* create an additional majority-minority district, not that the State's failure to do so violated §2 of the Voting Rights Act. To show the latter, plaintiffs' illustrative maps must satisfy two conditions: Plaintiffs cannot use race as a districting criterion in drawing illustrative maps, and illustrative maps must meet all the State's legitimate districting objectives, including traditional districting criteria and the State's specified political goals. Pp. 29–30.

(2) To satisfy the second and third preconditions—politically cohesive voting by the minority and racial-bloc voting by the majority—the plaintiffs must provide an analysis that controls for party affiliation, showing that voters engage in racial-bloc voting that cannot be explained by partisan affiliation. P. 30.

(3) On the "totality of circumstances" inquiry, the focus must be on evidence that has more than a remote bearing on what the Fifteenth Amendment prohibits: present-day intentional racial discrimination regarding voting. Discrimination that occurred some time ago and present-day disparities characterized as ongoing "effects of societal discrimination" are entitled to much less weight. *Shaw* v. *Hunt*, 517 U. S. 899, 909–910. Pp. 30–31.

(c) Nothing in *Allen* v. *Milligan*, 599 U. S. 1, dictates a different result. That case merely addressed whether Alabama's novel evidentiary standard required a change to existing §2 precedent. *Allen* did not address whether "race-based redistricting" under §2 could "extend indefinitely into the future" despite significant changes in conditions, 599 U. S., at 45 (KAVANAUGH, J., concurring in part), nor did it address whether §2 plaintiffs must disentangle race from politics in proving their case. Indeed, *Allen* did not address the Fourteenth Amendment at all. But here, the decision before the Court is based on the Fourteenth Amendment. Pp. 31–32.

(d) Under the updated *Gingles* framework, the facts of this suit easily require affirmance. Louisiana's enactment of SB8 triggered strict scrutiny because the State's underlying goal was racial. The State configured District 6 to achieve a black voting-age population over 50% because the *Robinson* court held that §2 likely required the creation of an additional majority-black district. The State's intentional compliance with the court's demands constituted an "express acknowledgment that race played a role in the drawing of district lines." *Alexander*, 602 U. S., at 8.

No compelling interest justifies SB8 because §2 did not require the

Syllabus

State to create a new majority-minority district.  At every step of the *Gingles* framework, the *Robinson* plaintiffs failed to prove their §2 case.  On the first *Gingles* precondition, the *Robinson* plaintiffs did not meet their burden because they did not provide an illustrative map that met all the State's nonracial goals, including the State's political goals.  On the second and third *Gingles* preconditions, the *Robinson* plaintiffs offered evidence that black and white voters consistently supported different candidates, but their analysis did not control for partisan preferences.  And on the totality of circumstances, the *Robinson* plaintiffs failed to show an objective likelihood of intentional discrimination, instead relying on historical evidence and evidence that failed to disentangle race from politics.  Pp. 32–35.

732 F. Supp. 3d 574, affirmed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined.  THOMAS, J., filed a concurring opinion, in which GORSUCH, J., joined.  KAGAN, J., filed a dissenting opinion, in which SOTOMAYOR and JACKSON, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

—————

Nos. 24–109 and 24–110

—————

LOUISIANA, APPELLANT
24–109                    *v.*
PHILLIP CALLAIS, ET AL.


PRESS ROBINSON, ET AL., APPELLANTS
24–110                    *v.*
PHILLIP CALLAIS, ET AL.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF LOUISIANA

[April 29, 2026]

JUSTICE ALITO delivered the opinion of the Court.

Section 2 of the Voting Rights Act of 1965, 52 U. S. C. §10301 *et seq.*, was designed to enforce the Constitution—not collide with it. Unfortunately, lower courts have sometimes applied this Court's §2 precedents in a way that forces States to engage in the very race-based discrimination that the Constitution forbids.

This tension between §2 and the Constitution came to a head when Louisiana redrew its congressional districts after the 2020 census. In 2022, a federal judge in the Middle District of Louisiana held that the map adopted by the state legislature likely violated §2 because it did not include an additional majority-black district. But when the State drew a new map that contained such a district, its new map was challenged as a racial gerrymander. A three-judge court in the Western District of Louisiana held that the new map

violated the Equal Protection Clause, and the State appealed to this Court.

The parties originally briefed and argued this suit last Term, and their arguments at that time highlighted problems in the existing body of §2 case law. One problem resulted from the rule that in racial gerrymandering cases, unlike other cases involving claims of racial discrimination, see, *e.g.*, *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 265–266 (1977), strict scrutiny is triggered only if race "predominated" in the State's decisionmaking process. In this suit, Louisiana adopted the challenged map and created the second majority-black district because it quite reasonably anticipated that, if it did not do so, the Middle District of Louisiana would order the use of a map with a differently configured second majority-black district that would effectively oust an incumbent whom the legislature sought to protect. Under our existing case law, that situation posed the question whether race or politics was the State's "predominant" motivation.

Another problem stemmed from the long-unresolved question whether compliance with the Voting Rights Act provides a compelling reason that may justify the intentional use of race in drawing legislative districts. For over 30 years, we have *assumed* for the sake of argument that the answer is yes. See *infra*, at 9–11. And we have gone further and assumed that it is enough if a State "'ha[s] a strong basis in evidence'" for thinking that the Voting Rights Act requires race-based conduct. *Cooper* v. *Harris*, 581 U. S. 285, 292–293 (2017). But allowing race to play any part in government decisionmaking represents a departure from the constitutional rule that applies in almost every other context.

These and other problems convinced us that the time had come to resolve whether compliance with the Voting Rights Act can indeed provide a compelling reason for race-based districting. We now answer that question: Compliance with

§2, *as properly construed*, can provide such a reason. Correctly understood, §2 does not impose liability at odds with the Constitution, and it should not have imposed liability on Louisiana for its 2022 map. Compliance with §2 thus could not justify the State's use of race-based redistricting here. The State's attempt to satisfy the Middle District's ruling, although understandable, was an unconstitutional racial gerrymander, and we therefore affirm the decision below.

I

A

Ratified in 1870, the Fifteenth Amendment provides that the "right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." For many years afterward, however, States "heavily suppressed" the right of black citizens to vote. *Brnovich* v. *Democratic National Committee*, 594 U. S. 647, 655 (2021). "States employed a variety of notorious methods, including poll taxes, literacy tests, property qualifications, white primaries, and grandfather clauses," in a "blatant" effort to suppress black voting. *Id.*, at 655–656, and n. 1 (citing H. R. Rep. No. 439, 89th Cong., 1st Sess., 8, 11–13 (1965); S. Rep. No. 162, 89th Cong., 1st Sess., pt. 3, pp. 4–5 (1965); brackets and internal quotation marks omitted). Even "as late as the mid-1960s, black registration and voting rates in some States were appallingly low." *Brnovich*, 594 U. S., at 656; see *South Carolina* v. *Katzenbach*, 383 U. S. 301, 309–315 (1966). In addition, States employed legislative districting schemes to prevent the election of black candidates and candidates that black voters preferred. See *Alexander* v. *South Carolina State Conference of the NAACP*, 602 U. S. 1, 35 (2024); *Gomillion* v. *Lightfoot*, 364 U. S. 339, 341 (1960).

Section 2 of the Fifteenth Amendment authorizes Congress to enact "appropriate legislation" to enforce the Amendment's protections, and in 1965 Congress invoked that power to enact the Voting Rights Act. *Brnovich*, 594 U. S., at 656. "The Act and its amendments in the 1970s specifically forbade some of the practices that had been used to suppress black voting," including literacy tests and poll taxes. *Ibid.*; see 52 U. S. C. §10301; §§4(a), (c), 79 Stat. 438–439; §6, 84 Stat. 315; §102, 89 Stat. 400, as amended, 52 U. S. C. §§10303(a), (c), 10501 (prohibiting the denial of the right to vote in any election for failure to pass a test demonstrating literacy, educational achievement or knowledge of any particular subject, or good moral character); see also §10, 79 Stat. 442, as amended, 52 U. S. C. §10306 (declaring poll taxes unlawful); §11, 79 Stat. 443, as amended, 52 U. S. C. §10307 (prohibiting intimidation and the refusal to allow or count votes). We upheld many of these provisions in *Katzenbach*, 383 U. S., at 316, 327–337.

Section 2 of the Voting Rights Act in its original form "closely tracked the language of the Amendment it was adopted to enforce." *Brnovich*, 594 U. S., at 656. At that time, §2 stated simply that "[n]o voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." 79 Stat. 437.

In *Mobile* v. *Bolden*, 446 U. S. 55 (1980), the Court interpreted this language, and four Justices concluded in a plurality opinion that "facially neutral voting practices violate §2 only if motivated by a discriminatory purpose." *Brnovich*, 594 U. S., at 658. Justice Stevens, who concurred in the judgment, proposed a different but similarly demanding standard. See *Bolden*, 446 U. S., at 90–94. Indeed, in his view, a districting practice, even if motivated in part by race, would not violate §2 so long as it was "supported by valid and articulable justifications." *Id.*, at 91–92.

*Bolden* roused "'an avalanche of criticism, both in the media and within the civil rights community.'" *Allen* v. *Milligan*, 599 U. S. 1, 11 (2023) (quoting T. Boyd & S. Markman, The 1982 Amendments to the Voting Rights Act: A Legislative History, 40 Wash. & Lee L. Rev. 1347, 1355 (1983)). Critics argued that a focus on discriminatory intent, rather than discriminatory effects, would defeat worthy claims because of the difficulty of proving intentional discrimination. See 599 U. S., at 11.

Members of Congress evidently shared these concerns. In 1982, shortly after *Bolden*, Congress sought to abrogate that decision by amending §2. A House bill was "originally passed . . . under a loose understanding that §2 would prohibit all discriminatory 'effects' of voting practices, and that intent would be 'irrelevant,'" but "[t]his version met stiff resistance in the Senate." *Mississippi Republican Executive Comm.* v. *Brooks*, 469 U. S. 1002, 1010 (1984) (Rehnquist, J., dissenting) (quoting H. R. Rep. No. 97–227, p. 29 (1981)). Critics worried that an effects test would lead to "mandat[ory] racial proportionality in elections," a scenario "regarded by many as intolerable." *Allen*, 599 U. S., at 12. The House and Senate eventually compromised, and the final product included both an effects test in §2(a) and a "robust disclaimer against proportionality" in §2(b). *Id.*, at 13.

This latter provision also specifies what a plaintiff must establish to prove a §2 violation. The provision requires consideration of the "totality of circumstances" in each case and demands proof that the "political processes leading to nomination or election in the State or political subdivision are not *equally open* to participation" by members of a protected class "*in that its members have less opportunity* than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U. S. C. §10301(b) (emphasis added). Congress took this language almost verbatim from Justice White's opinion for the Court in *White* v. *Regester*, 412 U. S. 755 (1973), which

involved a "vote dilution" claim, *i.e.*, a claim that a districting scheme impermissibly lessens the weight of the votes of minority voters.

In *White*, the Court affirmed a judgment that Texas had used two multimember electoral districts "invidiously to cancel out or minimize the voting strength of racial groups." *Id.*, at 765. According to *White*, a vote-dilution plaintiff had to show that "the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." *Id.*, at 766.

The decision in *White* did not say anything one way or another about proof of discriminatory purpose or intent, but the Court's rationale rested on evidence that gave rise to an obvious inference that the State had set out to prevent the election of candidates preferred by minority voters. The Texas districting scheme generally used single-member districts but employed multimember districts in two parts of the State where single-member districts might have resulted in the election of minority candidates. The Court observed that the use of multimember districts is not "necessarily" or "per se" unconstitutional, but it recognized that such districts can be employed to achieve discriminatory ends. *Id.*, at 765; see also *Perkins* v. *Matthews*, 400 U. S. 379, 389 (1971) (observing that a switch to at-large elections could be a "metho[d] to maintain white control of the political process"); *Allen* v. *State Bd. of Elections*, 393 U. S. 544, 569 (1969) (explaining that a change to at-large voting could nullify the ability of minority voters to elect their candidate of choice). The Court also cited strong evidence that the legislature had done so in the case at hand. Writing at a time when the Democratic Party was dominant in much of Texas, the Court noted that a "white-dominated organization," which had "effective control" over candidate slating

within that party, had engaged in "'racial campaign tactics in white precincts to defeat candidates who had the overwhelming support of the black community,'" thereby "'effectively exclud[ing]'" the black community "'from participation in the Democratic primary selection process.'" *White*, 412 U. S., at 766–767. The Court likewise cited evidence that the legislature had "invidiously excluded Mexican-Americans from effective participation in political life, specifically in the election of representatives to the Texas House of Representatives." *Id.*, at 769. Thus, *White* presented a situation in which circumstantial evidence suggested very strongly that the State had created multimember districts for the purpose of diluting minority votes.

A few years later, when Congress looked for language that would abrogate *Mobile* v. *Bolden*'s interpretation of §2, it selected terms that were nearly identical to language used in *White*. The accompanying Report of the Senate Judiciary Committee explained that the amendment's purpose was to repudiate *Bolden* and establish a new vote-dilution test based on *White*. See S. Rep. No. 97–417, pp. 2, 15–16, 27 (1982).

B

This Court first construed the amended version of §2 in *Thornburg* v. *Gingles*, 478 U. S. 30 (1986). *Gingles* concerned a challenge to North Carolina's multimember districting scheme on the ground that it diluted the vote of black citizens. *Id.*, at 34–36. *Gingles* was decided at a time when this Court often paid insufficient attention to the language of statutory provisions, and Justice Brennan's opinion for the Court followed this pattern. Instead of analyzing what the statute said, the opinion simply "quoted the text of amended §2 and then jumped right to the Senate Judiciary Committee Report." *Brnovich*, 594 U. S., at 667; see *Gingles*, 478 U. S., at 42–46. Relying heavily on that Report, the opinion set out three threshold requirements for

proving a §2 vote-dilution claim, plus a nonexhaustive list of factors to be considered in making a final decision as to whether the State had violated §2. See *id.*, at 44–45, 48–51, 80.

To succeed in proving a §2 violation, *Gingles* taught, a plaintiff must make four showings. First, the plaintiff must show that the minority group in question is "sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." *Wisconsin Legislature* v. *Wisconsin Elections Comm'n*, 595 U. S. 398, 402 (2022) (*per curiam*) (citing *Gingles*, 478 U. S., at 50–51). A district is reasonably configured, we later explained, "if it comports with traditional districting criteria, such as being contiguous and reasonably compact." *Allen*, 599 U. S., at 18. "Second, the minority group must be able to show that it is politically cohesive." *Gingles*, 478 U. S., at 51. Third, "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Ibid.* "Finally, a plaintiff who demonstrates the three preconditions must also show, based on the 'totality of circumstances,' that the political process is not 'equally open' to minority voters." *Allen*, 599 U. S., at 18 (quoting *Gingles*, 478 U. S., at 45–46).

C

In later cases, redistricting plans that States created to comply with the Voting Rights Act were themselves challenged as racial gerrymanders. This Court approached such cases by building on the framework from other racial-discrimination cases under the Equal Protection Clause. In those cases, if race played a role in a decision made by a government actor, strict scrutiny applied. See *Arlington Heights*, 429 U. S., at 265–266. Under this standard, the government needed to assert a compelling interest that justified its use of race; and if the analysis progressed beyond this point, the government had to show that its use of race

Opinion of the Court

was narrowly tailored to vindicate that interest. See, *e.g.*, *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 206 (2023) (*SFFA*).

The Court modified this framework for racial gerrymandering cases. Although *any* use of race in government decisionmaking generally triggers strict scrutiny, in gerrymandering cases a challenger must show that race was the government's predominant consideration. See *Bush* v. *Vera*, 517 U. S. 952, 964 (1996) (plurality opinion). And in cases where race predominated, States would sometimes assert that compliance with the Voting Rights Act provided a compelling interest justifying the use of race. Yet we never decided whether compliance with the Act could constitute a compelling interest. Instead, we repeatedly assumed without deciding that the Voting Rights Act could constitute a compelling interest because in all those cases, the Act actually did not demand the State's race-predominant districting. Thus, the States in those cases could not satisfy strict scrutiny regardless of whether compliance with the Voting Rights Act could provide a compelling interest.

The first case in which the Court explicitly made this assumption was *Miller* v. *Johnson*, 515 U. S. 900, 917–920 (1995),[1] which concerned a majority-black district that was designed to satisfy the Justice Department's preclearance demands under §5 of the Voting Rights Act. The *Miller* Court first found that the legislature had "subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Id.*, at 916. For this reason, the Court held, race had predominated in the creation of the new district, and the State had to "demonstrate

--------

[1] Such an assumption may have been implicit in *Shaw* v. *Reno*, 509 U. S. 630, 653–656 (1993) (*Shaw I*).

that its districting legislation [wa]s narrowly tailored to achieve a compelling interest." *Id.*, at 920. The Court declined to address "[w]hether or not in some cases compliance with the [Voting Rights Act], standing alone, c[ould] provide a compelling interest independent of any interest in remedying past discrimination." *Id.*, at 921. Instead, the Court explained that the "challenged district was not reasonably necessary under a constitutional reading and application" of the Voting Rights Act, so the State's goal of complying with the Act could not supply a compelling interest. *Ibid.*

We repeated much the same analysis in *Shaw* v. *Hunt*, 517 U. S. 899, 908 (1996) (*Shaw II*), applying strict scrutiny to a redistricting plan that a State crafted to comply with both §2 and §5 of the Voting Rights Act. "[O]nce again," we did not reach the question "expressly left open" in *Miller*: whether the Voting Rights Act could itself provide a compelling interest to justify race-predominant districting. 517 U. S., at 911. After "assum[ing], *arguendo*, for the purpose of resolving this suit, that compliance with §2 could be a compelling interest," we held that the plan failed strict scrutiny because it was not reasonably required under a constitutional reading and application of the Voting Rights Act. *Id.*, at 915.

Likewise, in *Alabama Legislative Black Caucus* v. *Alabama*, 575 U. S. 254, 259 (2015), we applied strict scrutiny to a race-predominant districting plan that the State had created for two purposes: first, to "come close to a one-person, one-vote ideal," and second, to "ensure compliance" with §5 of the Voting Rights Act. We held that, even if the Voting Rights Act could provide a compelling interest, the map did not satisfy strict scrutiny because it was not required by the Act. *Id.*, at 277. Once again, we left open whether compliance with the Act "remain[ed] a compelling interest." *Id.*, at 279.

Opinion of the Court

In *Cooper*, 581 U. S., at 301, we continued our "long"-standing assumption that "complying with the VRA is a compelling interest." Again, we did not need to resolve this question because a constitutional reading and application of the Act did not require the district at issue. *Id.*, at 306. And again, in *Wisconsin Legislature*, we once more "assumed that complying with the [Voting Rights Act] is a compelling interest." 595 U. S., at 401. But because the Wisconsin Supreme Court had not properly analyzed whether the Act required the map at issue, we remanded for the court to "undertake a full strict-scrutiny analysis." *Id.*, at 406. This was the legal framework in place when the lawsuits involving Louisiana's congressional districts were filed and litigated in the lower courts.

## II

As noted earlier, the underlying litigation in this suit resulted from Louisiana's response to the population changes disclosed by the 2020 census. The subsequent reapportionment of House seats among the States left Louisiana with the same number of seats—six—that it had previously been allocated, but due to shifts in population, the State needed to recalibrate its districts.



Figure 1. Louisiana's map from 2013–2022

In 2022, Louisiana enacted a new map, "HB1," that closely resembled its immediate predecessor:



Figure 2. HB1, enacted in 2022

HB1, like its predecessor, included only one district in which black voters were a majority of the voting-age population. (In the above maps, it is the bat-shaped District 2 that includes much of New Orleans, blue in Figure 1 and yellow in Figure 2.) As soon as HB1 was enacted, lawsuits were filed in the Middle District of Louisiana asserting that the map violated the Voting Rights Act by "'packing' large numbers of Black voters into a single majority-Black congressional district . . . and 'cracking' the remaining Black voters among the other five districts." *Robinson* v. *Ardoin*, 605 F. Supp. 3d 759, 768 (2022). After the suit was filed, the *Robinson* court issued a lengthy opinion concluding that HB1 likely violated the Voting Rights Act by failing to include a second majority-black district. The court thus entered a preliminary injunction requiring Louisiana to

implement a new map before the 2022 election, which was less than six months away. *Id.*, at 856.

Louisiana objected to the decision and promptly appealed. But because of circumstances outside the State's control, its appeal ended up in limbo. This Court granted certiorari before judgment and held the case pending a decision in *Allen*. Nearly a year later, after deciding *Allen*, the Court dismissed the petition as improvidently granted and remanded the case to the Fifth Circuit to consider Louisiana's appeal in the ordinary course. By that time, the 2022 election had passed, and the urgency that had justified the preliminary injunction was no longer present. In a tentatively worded opinion, the Fifth Circuit held that the *Robinson* District Court's decision "was valid when it was issued" but that the preliminary injunction was no longer needed. *Robinson* v. *Ardoin*, 86 F. 4th 574, 599–600 (2023).

In the absence of urgency, the Fifth Circuit remanded the case to the District Court with instructions to give Louisiana time to draw a new map. If Louisiana failed to do so, the Fifth Circuit suggested, the District Court could proceed with a trial on the merits and, if needed, remedial proceedings. *Id.*, at 601–602.

After the Fifth Circuit's remand, Louisiana did not have many options. In the *Robinson* decision, the District Court held that the plaintiffs were "likely to prevail" on their claim that the Voting Rights Act demanded the creation of a second majority-black district. 605 F. Supp. 3d, at 851. So if Louisiana refused to adopt such a map, the District Court would likely draw one and mandate its use. Wishing to avoid that outcome, Louisiana decided to draw its own map. After a deliberative process, Louisiana enacted the map at issue in this suit: SB8.



Figure 3. SB8

SB8 retains the original majority-minority district from HB1 (above in yellow). It then adds an additional majority-minority district, District 6 (above in green). To attain a majority-black voting-age population, District 6 connects black populations from Baton Rouge and Lafayette (in the southcentral region of the State) with the black population in Shreveport (in the far northwest of the State). SB8 differed from the illustrative maps—shown below—on which the District Court relied in *Robinson*:

Opinion of the Court



Figure 4. *Robinson* Court's Illustrative Maps

These illustrative maps also include a second majority-minority district, but one with very different boundaries (shown in blue in the top four maps and in green in the

bottom two maps). This district connects largely urban
black communities in Baton Rouge and Lafayette with more
rural black communities in the northeast corner of the
State. By contrast, SB8's District 6 connects the Baton
Rouge and Lafayette black populations with the distant
black population in Shreveport, in the northwest. Louisi-
ana adopted this scheme, rather than the one used in the
*Robinson* illustrative maps, because it protects the Repub-
lican incumbents the State considered most important:
Speaker of the House Mike Johnson, House Majority
Leader Steve Scalise, and Appropriations Committee mem-
ber Julia Letlow. See Brief for Appellant in No. 24–109, pp.
13–14, 17.

Not long after SB8 was enacted, another lawsuit was
filed, this time in the Western District of Louisiana. A
group of plaintiffs (the *Callais* plaintiffs) asserted that SB8,
and specifically District 6, was a racial gerrymander that
violated the Equal Protection Clause. The plaintiffs from
*Robinson* intervened in the litigation, seeking to defend
Louisiana's decision to draw a second majority-minority
district. Because the *Callais* plaintiffs challenged "the con-
stitutionality of the apportionment of congressional dis-
tricts," a District Court of three judges was convened to
hear the suit. 28 U. S. C. §2284(a). The court held a 3-day
preliminary injunction hearing, which was consolidated
with a trial on the merits.

Observing that SB8's "second majority-minority district
. . . stretches some 250 miles from Shreveport in the north-
west corner of the state to Baton Rouge in southeast Loui-
siana, slicing through metropolitan areas to scoop up pock-
ets of predominantly Black populations from Shreveport,
Alexandria, Lafayette, and Baton Rouge," the court con-
cluded that the map effected a racial gerrymander that "vi-
olates the Equal Protection Clause." *Callais* v. *Landry*, 732
F. Supp. 3d 574, 582, 588 (WD La. 2024). Judge Stewart of
the Fifth Circuit dissented. See *id.*, at 614. The State of

Louisiana and the *Robinson* intervenors appealed the decision directly to this Court, and the Court noted probable jurisdiction. 604 U. S. 1007 (2024). See 28 U. S. C. §1253.

After an initial round of briefing and argument last Term, the Court restored these cases to the calendar for reargument this Term. See 606 U. S. 923 (2025). We ordered supplemental briefing on the following question: "Whether the State's intentional creation of a second majority-minority congressional district violates the Fourteenth or Fifteenth Amendments to the U. S. Constitution." 606 U. S. 993 (2025). And because the State's intentional creation of a second majority-minority district had been prompted by an order suggesting that such a district is required by the Voting Rights Act, our question necessarily implicated the correctness of our longstanding assumption that compliance with the Voting Rights Act may justify what the Constitution generally condemns: the use of race as a basis for government action. This question was pending in several lower-court cases, but in light of the potential impact of those cases on upcoming elections, we concluded that resolution of the question in this suit was appropriate.

## III
### A

In considering whether the Constitution permits the intentional use of race to comply with the Voting Rights Act, we start with the general rule that the Constitution almost never permits the Federal Government or a State to discriminate on the basis of race. Such discrimination triggers strict scrutiny, and our precedents have identified "only two compelling interests" that can satisfy that standard. *SFFA*, 600 U. S., at 207. One compelling interest, not relevant here, is "avoiding imminent and serious risks to human safety in prisons, such as a race riot." *Ibid.*; see *Johnson* v. *California*, 543 U. S. 499, 512–513 (2005). The only other compelling interest we have found is "remediating specific,

identified instances of past discrimination that violated the Constitution or a statute." *SFFA*, 600 U. S., at 207.

To "rise to the level of a compelling state interest," an effort to remediate past discrimination "must satisfy two conditions." *Shaw II*, 517 U. S., at 909. "First, the discrimination must be 'identified discrimination.'" *Ibid.* (quoting *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 499, 500, 505, 507, 509 (1989)). In other words, the State or Federal Government must identify the specific instances of past discrimination that it aims to remediate and, in light of that specification, must "'determine the precise scope of the injury it seeks to remedy.'" 517 U. S., at 909 (quoting *Croson*, 488 U. S., at 498 (opinion for the Court)). The States and Federal Government have no compelling interest in generally remediating "past discrimination in a particular industry or region" or "the effects of societal discrimination." 517 U. S., at 909–910. Second, after identifying the specific instance of discrimination, "the institution that makes the racial distinction must have . . . a 'strong basis in evidence' to conclude that [its] remedial action [is] necessary." *Id.*, at 910 (quoting *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 277 (1986)).

"Our acceptance of race-based state action has been rare for a reason." *SFFA*, 600 U. S., at 208. "'Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'" *Ibid.* (quoting *Rice* v. *Cayetano*, 528 U. S. 495, 517 (2000)). And in redistricting, "where the State assumes from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls,' it engages in racial stereotyping at odds with equal protection mandates." *Miller*, 515 U. S., at 920 (quoting *Shaw I*, 509 U. S. 630, 647 (1993)).

The question before us now is whether compliance with the Voting Rights Act should be added to our very short list

of compelling interests that can justify racial discrimina-
tion. To answer that question, we must understand exactly
what §2 of the Voting Rights Act demands with respect to
the drawing of legislative districts. We therefore turn to
the text of that provision.

### B
#### 1

As amended in 1982, §2 states:

> "(a) No voting qualification or prerequisite to voting
> or standard, practice, or procedure shall be imposed or
> applied by any State or political subdivision in a man-
> ner which results in a denial or abridgement of the
> right of any citizen of the United States to vote on ac-
> count of race or color . . . as provided in subsection (b).
>
> "(b) A violation of subsection (a) is established if,
> based on the totality of circumstances, it is shown that
> the political processes leading to nomination or election
> in the State or political subdivision are not equally
> open to participation by members of a class of citizens
> protected by subsection (a) in that its members have
> less opportunity than other members of the electorate
> to participate in the political process and to elect rep-
> resentatives of their choice. The extent to which mem-
> bers of a protected class have been elected to office in
> the State or political subdivision is one circumstance
> which may be considered: *Provided*, That nothing in
> this section establishes a right to have members of a
> protected class elected in numbers equal to their pro-
> portion in the population." 52 U. S. C. §10301.

This is not the easiest language to parse, and we will
therefore break it down in steps. Beginning with subsection
(a), we take as given that a legislative districting map may
constitute a "standard, practice, or procedure." If that were
not so, there would have been no statutory basis for any of

our §2 vote-dilution cases. See *Holder* v. *Hall*, 512 U. S. 874, 895–896 (1994) (THOMAS, J., concurring in judgment). Therefore, subsection (a) means that a districting map may run afoul of §2 if it "results in a denial or abridgement" of the right to vote "on account of race or color."

With that established, subsection (b) explains when such a denial or abridgment occurs: when "the political processes leading to nomination or election" are "not equally open to participation by" members of a racial group of voters "in that [they] have less opportunity than other members of the electorate to . . . elect representatives of their choice." §2(b).

In this complicated verbal formulation, the key concept for present purposes is "less opportunity than other members of the electorate to . . . elect representatives of their choice." *Ibid.* This language sets a baseline against which to assess the opportunity of minority voters: the "opportunity" that "other members of the electorate" have "to elect" their preferred candidates. To understand this baseline, we must nail down the meaning of three terms: "less opportunity," "other members of the electorate," and "elect."

In isolation, "opportunity" could refer to either a desired outcome or a chance to achieve that outcome. As used in §2(b), however, "opportunity" must mean a *chance* to achieve a desired result, because the Voting Rights Act does not guarantee equal outcomes. See *White*, 412 U. S., at 765–766. Accordingly, "less opportunity" must mean a lesser chance. In ordinary usage, "less opportunity" often takes on such meaning. One might say, for example, that men under 6 feet tall have less opportunity to play in the NBA than those who stand at least 6 feet 7 inches (the current median).

The next term—"other members of the electorate"—specifies the comparator to be used in determining whether the group protected by subsection (a) has suffered or is threatened with suffering "less opportunity . . . to elect representatives of their choice." In conceptualizing the members of

this comparator group, we may think of a randomly selected member of the electorate who has particular voting preferences, or we may think of a randomly selected group of voters who share certain voting preferences. These voting preferences may be based on a candidate's party affiliation, ideology, stance on a particular policy issue, personal charisma, or some other characteristic or set of characteristics. But whatever they are, the situation of these randomly selected voters must be compared with that of minority voters alleged to have suffered vote dilution.

This brings us to the final term: "to elect." As used in §2(b), this term must refer to the achievement of electoral victory by casting a ballot.

Putting all these terms together, the baseline is the chance enjoyed by nonminority voters to secure the election of their preferred candidates. What, then, is the chance that any given nonminority voter or group of nonminority voters has to secure the election of a preferred candidate? The answer to this question depends on the voting preferences of other voters in the district. For example, in a district where most voters prefer Democratic candidates, a Republican voter in that district will have a low chance of securing the election of his or her preferred candidate. But that chance would be substantially higher if the district were instead filled with voters who prefer Republican candidates. The roster of voters who end up in a given district depends, in turn, on the districting criteria used by the State in drawing a legislative map.

If a districting map is produced by computer, as is generally the case today, we may think of all the parameters in the algorithm that the mapmaker uses. One necessary parameter would be the number of districts required by law, and another would have to be a range of inter-district population variations that is small enough to comply with the one-person, one-vote requirement. The algorithm might then go on to lay out and assign priorities to whatever

additional permissible criteria the legislature chooses to use. For example, the legislature might want to minimize changes in the prior map, avoid districts with discontiguous territory, and avoid splitting counties or municipalities. It might impose a certain standard of compactness, aim to protect some or all incumbents, or promote the prospects of a particular political party. When this algorithm is used, the map it produces may place a particular voter or group of voters in a district in which a majority generally agrees, generally disagrees, or only sometimes agrees with their voting preferences. But in any event, the "opportunity" of these "members of the electorate" to contribute their votes to a winning cause is whatever opportunity results from the application of the State's combination of permissible criteria.

That is what our randomly selected individual voter and group of voters can expect regarding their opportunity to elect a preferred candidate. And under §2, a minority voter is entitled to nothing less and nothing more.

2

Not only is this the best reading of the statutory text, but it also ensures that §2 of the Voting Rights Act does not exceed Congress's authority under §2 of the Fifteenth Amendment. That provision confers the "power to enforce [the Amendment] by appropriate legislation." Thus, to lie within Congress's authority, §2 of the Voting Rights Act must "effectuate by 'appropriate' measures the constitutional prohibition" in §1 of the Fifteenth Amendment. *Katzenbach*, 383 U. S., at 308.

Our Fourteenth and Fifteenth Amendment jurisprudence delineates what constitutes "appropriate" legislation in the sense relevant here. See *City of Boerne* v. *Flores*, 521 U. S. 507, 518 (1997) (stating that Congress has "parallel power to enforce the provisions" of the Fourteenth and Fifteenth Amendments). In legislation enforcing these Amendments,

"[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.*, at 520.

As the Court has long held, the Fifteenth Amendment bars only state action "'motivated by a discriminatory purpose.'" *Reno* v. *Bossier Parish School Bd.*, 520 U. S. 471, 481 (1997) (quoting *Mobile*, 446 U. S., at 62). So a law that seeks to enforce the Fifteenth Amendment by prohibiting mere disparate impact would fail to enforce a right that the Amendment secures. That is never "appropriate," *Katzenbach*, 383 U. S., at 308, because Congress cannot "enforce a constitutional right by changing what the right is," *City of Boerne*, 521 U. S., at 519.

For this reason, the focus of §2 must be enforcement of the Fifteenth Amendment's prohibition on *intentional* racial discrimination. When §2 is properly interpreted in the way we have outlined, it is sufficiently congruent with and proportional to the Amendment's prohibition. While that interpretation does not demand a finding of intentional discrimination, it imposes liability only when the circumstances give rise to a strong inference that intentional discrimination occurred. Suppose, for example, that the application of a State's districting algorithm yields numerous maps with districts in which the members of a minority group constitute a majority, and suppose that the State cannot provide a legitimate reason for rejecting all those maps and eliminating all majority-minority districts. In such a situation, the inference of racial motivation is strong, and §2 of the Fifteenth Amendment permits the imposition of liability without demanding that the courts engage in the fraught enterprise of attempting to determine whether the state legislature as an institution, as opposed to certain individual members or the State's hired mapmaker, was motivated by race.

Only when understood this way does §2 of the Voting Rights Act properly fit within Congress's Fifteenth

Amendment enforcement power. See, *e.g.*, *I. N. S.* v. *St. Cyr*, 533 U. S. 289, 299–300 (2001) ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems" (citation omitted)). By contrast, interpreting §2 of the Voting Rights Act to outlaw a map solely because it fails to provide a sufficient number of majority-minority districts would create a right that the Amendment does not protect. And such an interpretation would run headlong into the Act's express disclaimer against racial proportionality.

Properly understood, §2 thus does not intrude on States' prerogative to draw districts based on nonracial factors. "Redistricting constitutes a traditional domain of state legislative authority." *Alexander*, 602 U. S., at 7. The Constitution imposes some important restrictions on the States' exercise of this power, but they are otherwise free to draw districts as they please. We have held that they may use traditional districting factors such as "compactness, contiguity," "maintaining the integrity of political subdivisions, preserving the core of existing districts," and protecting incumbents. *Bush*, 517 U. S., at 964; *Miller*, 515 U. S., at 906, 916. Nothing in the Constitution requires States to heed these criteria, of course, and the desirability of some of these criteria might be disputed. But because they are not forbidden by the Constitution, it is up to each State to decide what weight, if any, they warrant.

The same is true with respect to the drawing of districts to achieve partisan advantage. Disapproval of partisan gerrymandering dates back to the founding. See *Rucho* v. *Common Cause*, 588 U. S. 684, 696–697 (2019). But partisan gerrymandering claims are not justiciable in federal court. *Id.*, at 718. "Federal judges have no license to reallocate political power between the two major political parties, with no plausible grant of authority in the

Constitution, and no legal standards to limit and direct their decisions." *Ibid.* Thus, in considering the constitutionality of a districting scheme, courts must treat partisan advantage like any other race-neutral aim: a constitutionally permissible criterion that States may rely on as desired.

For this reason, as we have repeatedly made clear, when a State defends a districting scheme on the ground that it was drawn for partisan purposes, plaintiffs have a "'special'" burden to overcome. *Alexander*, 602 U. S., at 9 (quoting *Cooper*, 581 U. S., at 308). "To prevail," the plaintiff "must 'disentangle race from politics' by proving 'that the former *drove* a district's lines.'" 602 U. S., at 9 (quoting *Cooper*, 581 U. S., at 308). "That means, among other things, ruling out the competing explanation that political considerations dominated the legislature's redistricting efforts. If either politics or race could explain a district's contours, the plaintiff has not cleared its bar." 602 U. S., at 9–10; see *Easley* v. *Cromartie*, 532 U. S. 234, 258 (2001) (*Cromartie II*) (rejecting a racial gerrymandering claim when the plaintiffs failed to show "that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles").

A plaintiff may carry its disentanglement burden by offering an alternative map that achieves all the State's objectives—including partisan advantage and any of the State's other political goals—at least as well as the State's map. See *Alexander*, 602 U. S., at 10; *Cromartie II*, 532 U. S., at 258. Today, §2 litigants almost always have the wherewithal to proffer such a map if there is one to be found. See *Abbott* v. *League of United Latin American Citizens*, 607 U. S. \_\_\_ (2025) (holding that the lack of an alternative map merits a "dispositive or near-dispositive adverse inference" against a racial-gerrymandering plaintiff ); *Alexander*, 602 U. S., at 10 ("[A]ny plaintiff with a strong case

has had every incentive to produce such an alternative map"); see also *Allen*, 599 U. S., at 23 (observing that "modern computer technology" allows challengers to "generate millions of possible districting maps for a given State"). But if a §2 plaintiff cannot disentangle race from the State's race-neutral considerations, including politics, then §2 cannot impose liability.

In short, §2 imposes liability only when the evidence supports a strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race. Not only does this interpretation follow from the plain text of §2, but it is consistent with the limited authority that the Fifteenth Amendment confers.

C

This interpretation of §2 does not require abandonment of the *Gingles* framework. We need only update the framework so it aligns with the statutory text and reflects important developments since we decided *Gingles* 40 years ago. Four historical developments are of particular note.

First, vast social change has occurred throughout the country and particularly in the South, where many §2 suits arise. As this Court has recognized, "things have changed dramatically" in the decades since the passage of the Voting Rights Act. *Shelby County* v. *Holder*, 570 U. S. 529, 547 (2013). At the time of the Act's passage, the Nation had faced nearly a century of "entrenched racial discrimination in voting, 'an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution.'" *Id.*, at 535 (quoting *Katzenbach*, 383 U. S., at 309). But the Voting Rights Act led to "great strides" in the ensuing decades: "voting tests were abolished, disparities in voter registration and turnout due to race were erased, and African-Americans attained political office in record numbers." 570 U. S., at 549, 553. By 2004, the racial gap in voter

registration and turnout had largely disappeared, with minorities registering and voting at levels that sometimes surpassed the majority. *Id*., at 547–548. Black voters now participate in elections at similar rates as the rest of the electorate, even turning out at higher rates than white voters in two of the five most recent Presidential elections nationwide and in Louisiana. See Supp. Brief for United States as *Amicus Curiae* 13 (citing Dept. of Commerce, Census Bureau, Voting and Registration Tables (Election of Nov. 2024) (Apr. 2025)).

Second, a full-blown two-party system has emerged in the States where §2 suits are most common. *Gingles* arose in the context of a one-party system in which black and white voters had starkly different voting patterns despite their affiliation within the same party. 478 U. S., at 59. In the area involved in *Gingles*, an overwhelming majority of white voters did not vote for any black candidate in the Democratic party primary elections, which for all practical purposes selected the candidates who would ultimately obtain office. *Ibid*. And in general elections, white voters in heavily Democratic areas often ranked black candidates last among Democrats. *Ibid*. Such intra-party disparities showed that black voters had less opportunity to elect their preferred candidate because of their race, not because of their partisan affiliation.

When the vast majority of voters, regardless of race, favors the same political party, a map that is disadvantageous for members of one racial group cannot be explained on the ground that it was drawn to favor a particular political party. But in a State where both parties have substantial support and where race is often correlated with party preference, a litigant can easily exploit §2 for partisan purposes by "repackag[ing] a partisan-gerrymandering claim as a racial-gerrymandering claim." *Alexander*, 602 U. S., at 21.

That brings us to the third significant post-*Gingles* development: this Court's decision in *Rucho*. In that decision, we held that claims of partisan gerrymandering are not justiciable in federal court. See 588 U. S., at 704–710. The upshot of *Rucho* was that, as far as federal law is concerned, a state legislature may use partisan advantage as a factor in redistricting. And litigants cannot circumvent that rule by dressing their political-gerrymandering claims in racial garb. Imposing liability "based on the racial effects of a political gerrymander in a jurisdiction in which race and partisan preference are very closely correlated . . . would, if accepted, provide a convenient way for future litigants and lower courts to sidestep our holding in *Rucho* that partisan-gerrymandering claims are not justiciable in federal court." *Alexander*, 602 U. S., at 21. "Instead of claiming that a State impermissibly set a target Republican-Democratic breakdown, a plaintiff could simply reverse-engineer the partisan data into racial data and argue that the State impermissibly set a particular [racial] target. Our decisions cannot be evaded with such ease." *Ibid.*

The fourth significant development since *Gingles* is the increased use and capabilities of computers in drawing districts and creating illustrative maps. With "modern computer technology" at the ready, §2 plaintiffs invariably invoke the assistance of experts who can generate thousands—or even millions—of maps. *Allen*, 599 U. S., at 23; see *id.*, at 33, 36 (involving more than 2 million expert-generated maps). Computer algorithms can "easily contro[l] for partisan preferences" and "other redistricting factors such as compactness and county splits." *Alexander*, 602 U. S., at 25. With the advent of such technology, *if* it is possible to identify an alternative map that fully achieves all the State's legitimate goals while producing "'greater racial balance,'" then a §2 plaintiff can easily do so. *Id.*, at 34–35 (quoting *Cromartie II*, 532 U. S., at 258).

In light of these significant developments, it is appropriate to update the *Gingles* framework and realign it with the text of §2 and constitutional principles.

### 1. First *Gingles* Precondition

The first *Gingles* precondition is that a community of minority voters must be sufficiently numerous and compact to constitute a majority in a reasonably configured district. To satisfy this precondition, many §2 plaintiffs have simply provided illustrative maps with their desired number of majority-minority districts. *E.g.*, *Allen*, 599 U. S., at 20. Such maps, however, are not alone sufficient. They prove only that the State *could* create an additional majority-minority district, not that the State's failure to do so violated §2 of the Voting Rights Act. To make the latter showing, plaintiffs' illustrative maps must satisfy two conditions.

First, in drawing illustrative maps, plaintiffs cannot use race as a districting criterion. If a plaintiff can produce an additional majority-minority district only by using race—a process that would be unconstitutional if a State engaged in such mapmaking, see *Alexander*, 602 U. S., at 6—that illustrative map sheds no light on whether the State acted unconstitutionally by *not* adopting such a map. Thus, an illustrative map in which race was used has no value in proving a §2 plaintiff's case.

Second, illustrative maps must meet all the State's legitimate districting objectives, including traditional districting criteria and the State's specified political goals. If the State's aims in drawing a map include a target partisan distribution of voters, a specific margin of victory for certain incumbents, or any other goal not prohibited by the Constitution, the plaintiffs' illustrative maps must achieve these goals just as well. If not, the plaintiffs would fail to demonstrate that the State's chosen map was driven by racial considerations rather than permissible aims. Only by meeting all the State's legitimate objectives can the illustrative

maps help to "disentangle race" from politics and other constitutionally permissible considerations. *Ibid.*

## 2. Second and Third *Gingles* Preconditions

To satisfy the second and third preconditions—politically cohesive voting by the minority and racial-bloc voting by the majority—the plaintiffs must provide an analysis that controls for party affiliation. In other words, they must show that voters engage in racial bloc voting that cannot be explained by partisan affiliation. This is, once again, critical for "disentangl[ing] race and politics." *Alexander*, 602 U. S., at 6.

The facts of *Gingles* afford a good example of how a §2 plaintiff can properly meet these preconditions. There, as discussed, black and white voters had dramatically different voting patterns *within* the Democratic party. 478 U. S., at 59. This type of intra-party racial-bloc voting pattern helps to demonstrate that the minority plaintiffs have "less opportunity" than their majority counterparts because of race, not just because of partisan affiliation. 52 U. S. C. §10301(b). By contrast, simply pointing to *inter*-party racial polarization proves nothing, because "'a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact.'" *Alexander*, 602 U. S., at 9 (quoting *Hunt* v. *Cromartie*, 526 U. S. 541, 551 (1999)).

## 3. Totality of Circumstances

Last, the "totality of circumstances" inquiry must focus on evidence that has more than a remote bearing on what the Fifteenth Amendment prohibits: present-day intentional racial discrimination regarding voting.

Discrimination that occurred some time ago, as well as present-day disparities that are characterized as the ongoing "effects of societal discrimination," are entitled to much

less weight. *Shaw II*, 517 U. S., at 909–910. Far more germane are "current data" and "'current political conditions'" that shed light on current intentional discrimination. *Shelby County*, 570 U. S., at 552–553 (quoting *Northwest Austin Municipal Util. Dist. No. One* v. *Holder*, 557 U. S. 193, 203 (2009)). "[I]n large part *because of* the Voting Rights Act[,] . . . our Nation has made great strides" in eliminating racial discrimination in voting. *Shelby County*, 570 U. S., at 548–549. And if, as a result of this progress, it is hard to find pertinent evidence relating to intentional present-day voting discrimination, that is cause for celebration.

D

Nothing in *Allen* dictates a result that differs from the one we reach today. The decision in that case was based on the State of Alabama's specific argument that its "race-neutral benchmark" was "necessary in any redistricting case." Brief for Appellants in *Allen* v. *Milligan*, O. T. 2022, Nos. 21–1086 etc., pp. 43–44 (Brief for Alabama). Alabama argued that deriving this benchmark—the "median or average number of majority-minority districts" in a race-blind "multimillion-map set," *Allen*, 599 U. S., at 23—required "computer simulations that are technically complicated, expensive to produce, and available to '[o]nly a small cadre of university researchers [that] have the resources and expertise to run' them," *id.*, at 36 (quoting Brief for United States as *Amicus Curiae* 28). Nonetheless, the State contended that its race-neutral benchmark was "the only plausible test" to ensure that §2 stays within "constitutional guardrails." Brief for Alabama 44, 75. We rejected that "single-minded view." *Allen*, 599 U. S., at 26. *Allen*, in short, was about whether Alabama's novel evidentiary standard required a change to our existing §2 precedent. See Tr. of Oral Arg. 8–9. It did not.

*Allen* did not address the central issue here. We had no occasion in *Allen* to confront the presumption that compliance with §2 may serve as a compelling interest for a State to satisfy strict scrutiny. Indeed, *Allen* did not discuss the Fourteenth Amendment at all. Here, by contrast, it is the linchpin of this suit.[2]

In addition, our decision in *Allen* did not reach two pivotal issues that we now squarely address. First, we left open whether "race-based redistricting" under §2, even if permissible when the Voting Rights Act was enacted in 1982, could "extend indefinitely into the future" despite significant changes in relevant conditions. 599 U. S., at 45 (KAVANAUGH, J., concurring in part); see *Shelby County*, 570 U. S., at 557 (requiring assessment of the constitutionality of the Voting Rights Act in light of current conditions). Second, because the State in *Allen* did not cite partisan goals in defending its map, we did not address whether §2 plaintiffs must disentangle race from politics in proving their case. Indeed, this is our first occasion to address the implications of *Rucho* in a vote-dilution case. Failing to account for political considerations in redistricting, as explained above, can allow plaintiffs to undo a State's legitimate, nonracial decisions under the banner of §2. In light of our answers to these questions left open in *Allen*, we now update the *Gingles* test to ensure a constitutional reading and application of §2.

_____

[2] The dissent claims that the Fourteenth Amendment is irrelevant to our analysis, *post*, at 39–40, n. 11 (opinion of KAGAN, J.), but the dissent appears to forget—or at least tries to lead readers to forget—that *the decision before us is based on the Fourteenth Amendment*. The plaintiffs claimed, and the court below held, that the map enacted by the state legislature in SB8 impermissibly discriminated on the basis of race and thus violated the plaintiffs' rights under the Fourteenth Amendment's Equal Protection Clause. See *supra,* at 16.

## IV

Under the updated *Gingles* framework, the facts of this suit easily require affirmance.

Louisiana's enactment of SB8 triggered strict scrutiny because the State's underlying goal was racial. The State never hid the ball: It configured District 6 to achieve a black voting-age population over 50% because it knew that if it failed to do so, the *Robinson* court would very likely find its map unlawful and order the use of something like the *Robinson* plaintiffs' illustrative maps, which would have imperiled one of the influential incumbents the legislature sought to protect. The State's intentional compliance with the court's demands constituted an "express acknowledgment that race played a role in the drawing of district lines." *Alexander*, 602 U. S., at 8. Louisiana therefore had to satisfy the "extraordinarily onerous" standard of proving that its use of race was narrowly tailored to further a compelling governmental interest. *Id.*, at 11.

No compelling interest justifies SB8. Section 2 does not provide a compelling interest because the State did not need to create a new majority-minority district to comply with the Act. That is because at every step of the *Gingles* framework, the *Robinson* plaintiffs failed to prove their §2 case.

On the first *Gingles* precondition, the *Robinson* plaintiffs did not meet their burden because they did not provide an illustrative map that met all the State's nonracial goals. The most obvious deficit in the plaintiffs' illustrative maps was the failure to meet the State's political goals, including incumbency protection. The plaintiffs' preferred map would have placed Representative Letlow in a majority-Democratic district and thus effectively ensured her exit from Congress. See Brief for Appellant in No. 24–109, at 14; 2 App. to Juris. Statement in No. 24–110, p. 673a (placing Representative Letlow in a district with over twice as many registered Democrats as registered Republicans).

The *Robinson* court erroneously concluded that the plaintiffs' illustrative maps protected incumbents because the maps left all six Representatives "in the district where they currently live" and "could avoid incumbent pairing." 605 F. Supp. 3d, at 830. That observation missed the point: An incumbent is not protected if he or she will lose re-election. And because the plaintiffs' illustrative maps failed to protect all the incumbents that the State sought to shield, the plaintiffs did not meet their burden on this precondition.

Nor did the plaintiffs meet their burden on the second and third *Gingles* preconditions. To show racially polarized voting, the *Robinson* plaintiffs offered evidence that black and white voters consistently supported different candidates, but their analysis did not control for partisan preferences. See 605 F. Supp. 3d, at 840.

Even if the *Robinson* plaintiffs had met their burden on the *Gingles* preconditions, they still would have failed to show an objective likelihood of intentional discrimination based on the totality of circumstances. The *Robinson* court went through the nine Senate Report factors, but none of the evidence it cited showed even a plausible likelihood of intentional discrimination by the State. Much of the cited evidence—such as the low number of black Louisianans who have been elected to Congress in recent decades—failed to disentangle race from politics. See 605 F. Supp. 3d, at 845–846. Indeed, the court observed that black voters have been aligned with the Democratic party for decades and that issues discussed by that party appealed to black voters. *Id.*, at 845. Those observations should have undercut, not strengthened, any showing of intentional racial discrimination because race and politics are so intertwined.

The *Robinson* court also relied on the "'sordid history'" of intentional discrimination by Louisianian officials in the decades before the Voting Rights Act's passage. *Id.*, at 846. And it cast aside as "irrelevant" the lack of evidence that

black voters had faced intentional discrimination in recent years. *Id.*, at 847. That analysis had its priorities backwards. The Fifteenth Amendment, which the Voting Rights Act enforces, "is not designed to punish for the past" but works "to ensure a better future." *Shelby County*, 570 U. S., at 553. The focus of §2 must therefore be on "current conditions," not on "decades-old data relevant to decades-old problems." *Ibid.* And none of the historical evidence presented by plaintiffs came close to showing an objective likelihood that the State's challenged map was the result of intentional racial discrimination.

In sum, because the Voting Rights Act did not require Louisiana to create an additional majority-minority district, no compelling interest justified the State's use of race in creating SB8. That map is an unconstitutional gerrymander, and its use would violate the plaintiffs' constitutional rights.

## V

The dissent's arguments are fully addressed in the prior sections of this opinion, but in closing we emphasize three points.

First, the dissent states over and over again that our decision requires a §2 plaintiff to prove discriminatory intent. *Post*, at 6, 23–26, 30–32, 37, 39–41, 45–46. What must be shown is exactly what the 1982 amendment of §2 called for. A §2 plaintiff in a vote dilution case must show that a districting scheme denies members of a racial group the same "opportunity" as other voters to elect the candidates they prefer. *Supra*, at 20–22. When that is shown, the circumstances are comparable to those in *White*, 412 U. S. 755, the decision from which the new language added by Congress in 1982 was drawn. That is, the circumstances must give rise to a strong inference of racial discrimination. See *supra*, at 23–26.

Second, contrary to the dissent's assertion, we have not overruled *Allen*. As is our general practice, the *Allen* Court adjudicated the case based on the parties' arguments, and in that case, the State did not defend its map on the ground that it was drawn to achieve a political objective. See *supra*, at 31–32. Here, the State has been forthright from the beginning that its aim was to protect the State's most prominent Republican House members. One may lament partisan gerrymandering, but for the reasons explained in *Rucho*, partisan gerrymandering claims are not justiciable in federal court. And in a racial gerrymandering case like the one before us, race and politics must be disentangled, as even the author of the dissent has acknowledged. See *Alexander*, 602 U. S., at 9; *Cooper*, 581 U. S., at 308 (opinion for the Court by KAGAN, J.) (holding that a racial-gerrymandering plaintiff must "disentangle race from politics and prove that the former drove a district's lines"). That is true regardless whether the case is brought pursuant to the Fourteenth Amendment or the VRA, since §2 of the VRA requires evidence giving rise to a strong inference of intentional discrimination. If race and politics are not disentangled and a §2 claim is cynically used as a tool for advancing a partisan end, the VRA's noble goal will be perverted.

Third, while the dissent wraps itself in the mantle of *stare decisis*, the dissent is unabashedly at war with key precedents. See *post*, at 45 (claiming that *Rucho* was disastrously wrong and should be cabined); *post*, at 5, 8–9, 42–43 (repeatedly criticizing *Shelby County* and citing the dissent in that case); *post*, at 4 (criticizing the Court's decision in *Brnovich*). Respect for precedent cannot be a one-way street.

\*　　\*　　\*

The judgment of the District Court is affirmed, and these cases are remanded for proceedings consistent with this opinion.

Opinion of the Court

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 24–109 and 24–110

_____

## LOUISIANA, APPELLANT
24–109	*v.*
## PHILLIP CALLAIS, ET AL.


## PRESS ROBINSON, ET AL., APPELLANTS
24–110	*v.*
## PHILLIP CALLAIS, ET AL.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF LOUISIANA

[April 29, 2026]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, concurring.

I join the Court's opinion in full. This Court should never have interpreted §2 of the Voting Rights Act of 1965 to effectively give racial groups "an entitlement to roughly proportional representation." *Thornburg* v. *Gingles*, 478 U. S. 30, 93 (1986) (O'Connor, J., concurring in judgment); see *ante*, at 23–24. By doing so, the Court led legislatures and courts to "systematically divid[e] the country into electoral districts along racial lines." *Holder* v. *Hall*, 512 U. S. 874, 905 (1994) (THOMAS, J., concurring in judgment). "Blacks [we]re drawn into 'black districts' and given 'black representatives'; Hispanics [we]re drawn into Hispanic districts and given 'Hispanic representatives'; and so on." *Ibid.* That interpretation rendered §2 "repugnant to any nation that strives for the ideal of a color-blind Constitution." *Id.*, at 905–906. Today's decision should largely put an end to this "disastrous misadventure" in voting-rights jurisprudence. *Id.*, at 893.

As I explained more than 30 years ago, I would go further and hold that §2 of the Voting Rights Act does not regulate districting at all. See *id.*, at 922–923. The relevant text prohibits States from imposing or applying a "voting qualification," "prerequisite to voting," or "standard, practice, or procedure," in a manner that results in a denial or abridgement of the right to vote based on race. 52 U. S. C. §10301(a). How States draw district lines does not fall within any of those three categories. *Holder*, 512 U. S., at 922–923 (opinion of THOMAS, J.); *Allen* v. *Milligan*, 599 U. S. 1, 46 (2023) (THOMAS, J., dissenting). The words in §2 instead "reach only 'enactments that regulate citizens' access to the ballot or the processes for counting a ballot'; they 'do not include a State's . . . choice of one districting scheme over another.'" *Ibid.* (quoting *Holder*, 512 U. S., at 945 (opinion of THOMAS, J.)). Therefore, no §2 challenge to districting should ever succeed.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 24–109 and 24–110

———————

## LOUISIANA, APPELLANT
24–109          *v.*
PHILLIP CALLAIS, ET AL.

## PRESS ROBINSON, ET AL., APPELLANTS
24–110          *v.*
PHILLIP CALLAIS, ET AL.

### ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF LOUISIANA

[April 29, 2026]

JUSTICE KAGAN, with whom JUSTICE SOTOMAYOR and JUSTICE JACKSON join, dissenting.

Consider the story of a hypothetical congressional district in a hypothetical State, subjected to a redistricting scheme. The example is admittedly stylized, but in its essence simulates the dispute before us, and clarifies the immense issues at stake. The district, let's say, is a single county, in the shape of a near-perfect circle, sitting in the middle of a rectangular State. The State is one with a long history of virulent racial discrimination, and its many effects, including in residential segregation and political division, remain significant even today. The population of the circle district is 90% Black; the rest of the State, divided into five surrounding districts, is 90% White. And voting throughout all those districts is racially polarized: Black residents vote heavily for Democratic candidates, while White residents vote heavily for Republicans. The circle district thus enables the State's Black community to elect a representative of its choice, whom no neighboring community would put in

office.  But that arrangement, in this not-so-hypothetical, is not to last.  The state legislature decides to eliminate the circle district, slicing it into six pie pieces and allocating one each to six new, still solidly White congressional districts. The State's Black voters are now widely dispersed, and (unlike the State's White voters) lack any ability to elect a representative of their choice.  Election after election, Black citizens' votes are, by every practical measure, wasted.

That is racial vote dilution in its most classic form.  A minority community that is cohesive in its geography and politics alike, and that faces continued adversity from racial division, is split—"cracked" is the usual term—so that it loses all its electoral influence.  Members of the racial minority can still go to the polls and cast a ballot.  But given the State's racially polarized voting, they cannot hope—in the way the State's White citizens can—to elect a person whom they think will well represent their interests.  Their votes matter less than others' do; they translate into less political voice.  Or, as this Court put it recently, the cracking makes "a minority vote unequal to a vote by a nonminority voter."  *Allen* v. *Milligan*, 599 U. S. 1, 25 (2023).

And because that is so, Congress in the Voting Rights Act made the practice illegal.  Section 2 of that Act guarantees that members of every racial group have an equal "opportunity" to "elect representatives of their choice."  52 U. S. C. §10301(b).  That promise arose from a far-too-prominent part of this Nation's history.  Even after the Fifteenth Amendment banned racial discrimination in voting, state officials routinely deprived African Americans of their voting rights.  Through a seemingly boundless array of mechanisms—most of them facially race-neutral and among them the drawing of district lines—States either prevented Black citizens from casting ballots or ensured that their votes would count for next to nothing.  The Voting Rights Act was meant as the corrective.  And when this Court construed it too narrowly—insisting that a person suing under

Section 2 had to prove discriminatory intent—Congress amended the law so that it turned solely on discriminatory effects. Under that revised version, a person has a good Section 2 claim if the challenged state action, in the "totality of circumstances," "*results in*" an electoral system "not equally open" to members of his racial group—meaning a system giving those citizens "less opportunity" to "participate in the political process and to elect representatives of their choice." §10301 (emphasis added). And for 40 years now, this Court has recognized that language to encompass districting decisions that, in the way illustrated above, result in vote dilution—the "minimiz[ing]" of minority voters' "ability to elect their preferred candidates." *Allen*, 599 U. S., at 18 (quoting *Thornburg* v. *Gingles*, 478 U. S. 30, 48 (1986)).

But no longer. Under the Court's new view of Section 2, a State can, without legal consequence, systematically dilute minority citizens' voting power. Of course, the majority does not announce today's holding that way. Its opinion is understated, even antiseptic. The majority claims only to be "updat[ing]" our Section 2 law, as though through a few technical tweaks. *Ante*, at 26, 29, 32. But in fact, those "updates" eviscerate the law, so that it will not remedy even the classic example of vote dilution given above. Without a basis in Section 2's text or the Constitution, the majority formulates new proof requirements for plaintiffs alleging vote dilution. Those demands, meant to "disentangle race from politics," *ante*, at 25, leverage two features of modern political life: that racial identity and party preference are often linked and that politicians have free rein to adopt partisan gerrymanders. The first fact—say, that in a given area, Black voters mainly support Democrats and White voters Republicans—was viewed before today as practically an element of a vote-dilution claim, because it indicates that a minority group is politically cohesive enough to elect a preferred representative but will be outvoted by the

majority bloc.  See *Allen*, 599 U. S., at 18, 22.  The second
fact—the result of a prior mistake by this Court—is some-
thing every day to regret, not to use as an excuse for strip-
ping minority citizens of their voting rights.  But under the
majority's new test, when those two facts coexist—which is
almost everywhere Section 2 still has purchase—a plaintiff
cannot prevail by showing that a redistricting *resulted in*
the dilution of minority voting power.  Rather, a plaintiff
will have to show—contrary to Section 2's clear text and de-
sign—that the legislators were "motivated by a discrimina-
tory *purpose*." *Ante*, at 23 (emphasis added).  And that, as
Section 2's drafters knew, is well-nigh impossible.

Today's ruling is part of a set: For over a decade, this
Court has had its sights set on the Voting Rights Act.  In
2013, the Court made a nullity of Section 5, the provision of
the Act enabling the Department of Justice to review and
block new voting rules—including redistrictings—in juris-
dictions with a history of voter suppression.  See *Shelby
County* v. *Holder*, 570 U. S. 529 (2013).  Congress had re-
cently, and after lengthy study, reauthorized that preclear-
ance mechanism.  It found the scheme still essential to
counter the protean techniques States can use to prevent
minorities from exercising their fair share of political influ-
ence.  But this Court thought it knew better.  "[T]hings have
changed dramatically," the Court explained, *id.*, at 547, ig-
noring that whether things had changed dramatically
*enough* to make the law dispensable was a question better
left to its democratically accountable authors.  Not surpris-
ingly, a flood of discriminatory voting laws followed, and
now only Section 2 stood in the gap.  In 2021, the Court did
half what was needed to raze that section too.  See *Brnovich*
v. *Democratic National Committee*, 594 U. S. 647 (2021).
Section 2 prohibits not only vote-diluting districting plans,
but also discriminatory burdens on the casting of ballots.
In a suit involving the latter type of law, the Court invented
a new legal standard making Section 2 useless, on the

theory that the statute as written was too "radical." See *id*.,
at 674. Since the Court ruled, not a single Section 2 suit
has successfully challenged such a restriction on voting,
however discriminatory in operation. See R. Hasen, The
Stagnation, Retrogression, and Potential Pro-Voter Trans-
formation of U. S. Election Law, 134 Yale L. J. 1673, 1686
(2025).

And finally, today, the last piece—Section 2 as applied to
redistricting. The last, and surely the hardest, for just
three Terms ago the Court upheld a vote-dilution challenge
to a districting map in a case much like this one—preserv-
ing Section 2 as a tool to prevent racially discriminatory re-
districting. See *Allen*, 599 U. S., at 17. "[W]e decline to
adopt," the Court said then, "an interpretation of §2 that
would revise and reformulate" our "§2 jurisprudence [of]
nearly forty years." *Id*., at 26. Nothing has changed in the
three years since. Yet today, the majority does "revise and
reformulate" . . . and destroy. It avails itself again of the
tools used before to dismantle the Act: untenable readings
of statutory text, made-up and impossible-to-meet eviden-
tiary requirements, disregard for precedent, and disdain for
congressional judgment. And in that way it greenlights re-
districting plans that will disable minority communities—
in Louisiana and across the Nation—from electing, as ma-
jority communities can, "representatives of their choice."
§10301(b). What if the districts in which minority citizens
exercise voting power are sliced up, and the pieces ap-
pended to districts in which they can play no meaningful
role? The majority tells us that the inability to make out a
Section 2 claim will just be a mark of the Nation's progress,
and therefore "cause for celebration." *Ante*, at 31.

I dissent. The Voting Rights Act is—or, now more accu-
rately, was—"one of the most consequential, efficacious,
and amply justified exercises of federal legislative power in
our Nation's history." *Shelby County*, 570 U. S., at 562
(Ginsburg, J., dissenting). It was born of the literal blood

of Union soldiers and civil rights marchers. It ushered in awe-inspiring change, bringing this Nation closer to fulfilling the ideals of democracy and racial equality. And it has been repeatedly, and overwhelmingly, reauthorized by the people's representatives in Congress. Only they have the right to say it is no longer needed—not the Members of this Court. I dissent, then, from this latest chapter in the majority's now-completed demolition of the Voting Rights Act.

## I

I begin with some history—both with what led originally to the Voting Rights Act and with how the current Section 2 came to be. The point is not to deliver a eulogy for the law—though, in truth, the Court's step-by-step slaying of voting rights now makes one appropriate. Rather, the object is to reveal how far today's decision repudiates past, and rightfully still controlling, congressional choices. As I'll later explain, the majority now demands that vote-dilution plaintiffs muster proof of racially discriminatory motive. See *infra*, at 23–32. In that way, the decision echoes an earlier one of this Court, which also held that Section 2 should function as an intent test. See *Mobile* v. *Bolden*, 446 U. S. 55 (1980). But Congress, as you'll soon see, amended Section 2 to reject that view: In light of the way voting discrimination had operated since the Fifteenth Amendment's adoption, Congress instead drafted Section 2 to bar the use of any electoral mechanism that would *result in* minority citizens having less opportunity than non-minority citizens to choose their political representatives.

## A

In the wake of the Civil War, Congress enacted and the States ratified the Fifteenth Amendment, to ensure the enfranchisement of Black Americans. Nearly 200,000 Black men had fought in the Union cause: "[W]hen the fight is

over," General Sherman counseled, "the hand that drops the musket cannot be denied the ballot." See A. Keyssar, The Right to Vote 69 (rev. ed. 2009) (Keyssar). And millions more African Americans had just become citizens, giving them a claim on political rights. The Fifteenth Amendment responded with a clarion promise of racial equality in voting: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

The Amendment's passage was a momentous occasion. It appeared to affirm that a mere few years after slavery's end, African Americans had become "equal members of the body politic." E. Foner, The Second Founding 111 (2019) (Foner). President Grant, in a message to Congress, called the Amendment "the most important event that has occurred since the nation came to life." *Ibid.* Black Americans similarly referred to the Amendment as the Nation's "second birth." *Ibid.* At one of the many celebrations ratification sparked, Frederick Douglass rejoiced that those just released from bondage were now "placed upon an equal footing with all other men": "Never," he declared, "was revolution more complete." Keyssar 82; Foner 112.

But all the hosannas were many years premature: "In the century that followed," the Fifteenth Amendment "proved little more than a parchment promise." *Allen*, 599 U. S., at 10. Violence and intimidation were ever-present ways to deny Black citizens their right to vote. But often force was not needed, because state laws could well enough accomplish that goal. Especially in the South, States soon put in place a host of facially race-neutral devices to systematically disenfranchise African American citizens. Poll taxes, literacy tests, "good character" exams, property qualifications, convoluted registration processes—all these and more, when combined with administrative discretion, effectively suppressed the Black vote, without much affecting

the White one.  See *South Carolina* v. *Katzenbach*, 383 U. S.
301, 311 (1966).  Congress could have acted: the Fifteenth
Amendment gave it the "power to enforce" minority voting
rights "by appropriate legislation."  But for decades it sat
mute while facially race-neutral voting rules succeeded in
"render[ing] the right to vote illusory" for Black Americans.
*Allen*, 599 U. S., at 10.  Louisiana's post-Reconstruction
rules, to cite the most pertinent example, took less than a
decade to drive the number of Black registered voters from
130,000 (in 1896) to 1,342 (in 1904).  See Keyssar 91.  The
numbers did not begin to climb until the end of World War
II (when Black soldiers returned from other battlefields),
and even then only slowly.  See 1 U. S. Commission on Civil
Rights Report 42 (1961).

Congress's initial efforts to counter voting discrimina-
tion—in the Civil Rights Acts of 1957, 1960, and 1964—did
little but prove the difficulty of the task.  Each of those stat-
utes authorized the Attorney General "to seek injunctions
against public and private interference with the right to
vote on racial grounds." *Katzenbach*, 383 U. S., at 313.  But
time and again, States found ways to evade the ensuing
court orders.  They "merely switched to discriminatory de-
vices not covered by" the court decrees, finding yet new
race-neutral rules (there seemed an endless number) that
would maintain the disparity between White and Black vot-
ing power. *Id*., at 314.  Congress thus learned of the "unre-
mitting and ingenious" methods States could use to resist
African American enfranchisement. *Id*., at 309.  Protecting
minority voting was like "battling the Hydra": "Whenever
one form of voting discrimination was identified and pro-
hibited, others sprang up in its place." *Shelby County*, 570
U. S., at 560 (Ginsburg, J., dissenting).

The Voting Rights Act of 1965 represented Congress's
most determined effort to stop the cycle.  Selma's Bloody
Sunday had galvanized the Nation to finally confront racial
disfranchisement.   Now Congress  enacted  legislation

making use of a double-barreled approach to ensure the Fifteenth Amendment's enforcement. Section 5 of the Act required that States or localities with a history of racial voter suppression obtain Department of Justice approval before implementing new voting districts or rules. An administrative review process thus would impede—at least, until this Court in *Shelby County* stopped it—the ever-inventive efforts of certain jurisdictions to deny or minimize minority voting. Meantime, Section 2 provided judicial recourse for victims of voting discrimination in all jurisdictions. That provision prohibited any election rule or practice that would "deny or abridge" the right to vote, thus imposing a "permanent, nationwide ban on racial discrimination in voting" (or so the Court assured the country when disabling Section 5). 42 U. S. C. §1973 (1970); *Shelby County*, 570 U. S., at 557. Taken together, Congress thought, the two mechanisms could "forever banish the blight of racial discrimination in voting"—effectively countering States' constantly morphing methods of suppressing minority ballots. *Allen*, 599 U. S., at 10.

### B

After the Act's passage—and partly because of its initial success—those methods more and more focused on vote dilution. The Act led to a large increase in minority voting registration: In just five years, almost as many African Americans registered to vote in six Southern States as in the entire century before 1965. See C. Davidson, The Voting Rights Act, in Controversies in Minority Voting 21 (B. Grofman & C. Davidson eds. 1992). And the Act mostly halted state efforts to prevent those new voters from casting ballots at all. So the States, as Congress noted when reauthorizing Section 5 in 1975, "resorted to [measures] which would dilute increasing minority voting strength." *City of Rome* v. *United States*, 446 U. S. 156, 181 (1980) (quoting H. R. Rep. No. 94–196, pp. 10–11 (1975)). Efforts to

minimize minorities' voting power took several forms. One
was to use at-large voting. A majority-White municipality,
for example, might exclude all African Americans from its
city council by scrapping geographic districts in favor of
citywide elections. See *Perkins* v. *Matthews*, 400 U. S. 379,
389 (1971). Another common dilution mechanism was just
to redraw single-member districts. Minority citizens could
be "packed": A racial community large enough to constitute
a majority in two normal districts—and therefore capable
of electing two representatives—might be crammed into a
single district instead. See *Voinovich* v. *Quilter*, 507 U. S.
146, 153–154 (1993). Or else minority citizens could be
"cracked," as in the hypothetical introducing this opinion.
See *supra*, at 1–2. Then, voters would be dispersed across
multiple districts so they could not muster a majority in
any. See *Voinovich*, 507 U. S., at 153. In either event, a
minority citizen's vote would "carry less weight than" it did
previously or than it would "in another, hypothetical dis-
trict." *Gill* v. *Whitford*, 585 U. S. 48, 67 (2018).

This Court soon held, in *White* v. *Regester*, 412 U. S. 755
(1973), that such practices could be unlawful because of
their effects—more specifically, because they result in une-
qual electoral opportunities for minority citizens. (Attend
closely here, because *White* becomes the template for the
current version of Section 2.) The plaintiffs in *White* chal-
lenged a Texas districting scheme that established multi-
member districts in two counties with concentrated urban
populations, even while using single-member districts
nearly everywhere else. The effect of the scheme, the plain-
tiffs charged, was to "minimize the voting strength of racial
groups"—both African Americans and Mexican Ameri-
cans—by putting them in a broad county-wide district in
which their votes would be swamped. *Id.*, at 765, 767. In
addressing that claim, the Court initially stated that it was
"not enough" to show that the districting scheme prevented
the minority groups from achieving proportional

representation—legislative seats in proportion to their population. *Id*., at 765. But that did not mean that the plaintiffs had to show that the State had acted with discriminatory intent. Rather, the Court held, the plaintiffs could prevail on a different kind of showing that a scheme's effect was to "minimize the voting strength of racial groups." *Ibid*. Under the Court's test, there was unlawful vote dilution if "the political process[]" was "not equally open to participation" by a racial group, so that "its members had less opportunity" than others "to participate in the political processes and to elect legislators of their choice." *Id*., at 766.

The Court in *White* found that test satisfied under a "totality of the circumstances" inquiry, which looked to how the multi-member districting scheme operated when "overlaid" on historical, social, and political "realities." *Id*., at 769. As part of that analysis, the Court noted the "history of official racial discrimination in Texas" and the persistent use of "racial campaign tactics" in elections. *Id*., at 766–767. But beyond such intentional race-based action, the Court looked to how the current or "residual" effects of past discrimination, including disparities in matters like housing, "education [and] employment," had political consequences. *Id*., at 768. Similarly, with respect to Mexican Americans, the Court considered evidence of "cultural and language barrier[s]" to political participation. *Ibid*. And finally, the Court homed in on political data itself, including voter registration and the infrequent election of Black or Hispanic candidates in majority-White districts. See *id*., at 766, 768–769. When all those factors were combined—in what the Court called "an intensely local appraisal"—the "impact" of the multi-member districts clearly emerged: Those districts denied minority voters equal "access to the

political process[],” “specifically in the election of [state] representatives.” *Id.*, at 767–769.[1]

Just seven years later, however, the Court did an about-face, now requiring a showing of discriminatory intent to succeed on a vote-dilution claim. In *City of Mobile* v. *Bolden*, the plaintiffs challenged an at-large election system for a three-member city commission. Under that system, Mobile’s Black population, which made up 35% of the total, had never managed to elect a candidate of its choice. But the Court did not embark on the kind of analysis employed in *White* to determine whether the system diluted Black votes. Instead, the Court’s controlling opinion held that Section 2 merely “restated the prohibitions” of the Fifteenth Amendment, which barred only intentional discrimination. 446 U. S., at 61 (plurality opinion); see *id.*, at 62–65. And the plaintiffs had produced no evidence of discriminatory motive. They could, the Court noted (as though it were the end of the matter), “register and vote without hindrance.” *Id.*, at 65. That their chosen candidates happened to always lose was beside the point. Because they could not show that

————————

[1] The majority’s description of the *White* Court’s “totality of the circumstances” analysis gives a false impression. According to the majority, “the Court’s rationale rested on evidence that gave rise to an obvious inference” that the State acted with “discriminatory purpose or intent.” *Ante*, at 6. That might be so of pieces of the evidence the Court relied on—for example, the use of “racial campaign tactics” by a party-affiliated organization. *Ante*, at 7; 412 U. S., at 767. And it is of course true that evidence of disparate impact can be of such magnitude (in this sphere as in others) as to indicate illicit intent. But the Court was crystal clear that its review of local conditions encompassed things “neither . . . improper nor invidious.” *Id.*, at 766. And indeed, its opinion reads more like a fine-grained report on political and social conditions than (as the majority would have it) a criminal bill of particulars. Most important (and as even the majority admits), the Court never suggested that the ultimate point of its analysis was to gauge the State’s intent. *Ante*, at 6. Rather, the point was just what the Court said: to decide whether Texas’s districting scheme in fact “operated to dilute [minorities’] voting strength.” 412 U. S., at 759.

the city had "*purposeful[ly]* exclu[ded]" them "from partici-pati[ng] in the election process," the Court held, they had no viable Section 2 suit. *Id.*, at 64 (emphasis added); see *Allen*, 599 U. S., at 11 (similarly describing *Bolden*).

*Bolden*, as the majority notes, triggered "an avalanche of criticism, both in the media and within the civil rights com-munity." *Ante*, at 5 (quoting *Allen*, 599 U. S., at 11). This Court recently noted a few of the assessments. "[T]he big-gest step backwards in civil rights" to come from the Court since the Voting Rights Act's passage. *Allen*, 599 U. S., at 11 (quoting N. Y. Times, Apr. 23, 1980, p. A22). And a "ma-jor defeat for blacks and other minorities fighting electoral schemes that exclude them from office." *Allen*, 599 U. S., at 11–12 (quoting Washington Post, Apr. 23, 1980, p. A5).

The problem, as even the majority recognizes, was "that a focus on discriminatory intent, rather than discrimina-tory effects, would defeat worthy claims because of the dif-ficulty of proving intentional discrimination." *Ante*, at 5. It is the rare legislature, as the history of voting discrimina-tion shows, that cannot camouflage racial targeting with race-neutral justifications. For that reason, *Bolden* brought vote-dilution claims to a near-standstill. The Department of Justice shelved the dilution cases it had intended to bring; and private plaintiffs filed just 10 such suits in the next year, compared with 60 the year before. See A. Ber-man, Give Us the Ballot 135 (2015). States, it seemed, could make minority votes meaningless without ever running into the Voting Rights Act.

But then Congress stepped in, to reverse *Bolden*'s intent requirement—and create the statute existing today. The House began the process with a simple change to Section 2's text. It replaced the words "to deny or abridge" with the phrase "in a manner which results in a denial or abridge-ment of," to make the section look like this:

"No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision *in a manner which results in a denial or abridgement of* the right of any citizen of the United States to vote on account of race or color." §10301(a) (emphasis added).

But a Senate subcommittee led by Senator Orrin Hatch objected. It thought the House's amendment would always require racially proportional representation, and advocated keeping Section 2—as construed by *Bolden*—just as it was. The impasse was resolved by Senator Bob Dole in the Judiciary Committee, through the addition of a subsection codifying the *White* decision. Recall that *White* had rejected proportional representation as the standard for vote-dilution claims. See *supra*, at 10–11. Now Senator Dole—while retaining the House's "results in" language—added a provision to do the same thing. See §10301(b) ("[N]othing in this section establishes a right to have members of a [racial group] elected in numbers equal to their proportion in the population"). And yet more important for present purposes, Senator Dole took language from *White* to clarify when a State would violate the ban on electoral rules that "result[] in a denial or abridgement" of voting. A violation is established, the Dole (but really the *White*) language stated,

"if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [racial group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." §10301(b).

That elaboration of when the effects of an electoral rule would cause a violation of Section 2 received bipartisan support. The amended Section 2 passed both the House and

the Senate by huge majorities; and in June 1982, President Reagan signed it into law.

An "oft-cited" Senate Report explained just what the 1982 amendment had accomplished: The new Section 2 repudiated *Bolden*'s intent requirement and adopted *White*'s "results test." *Brnovich*, 594 U. S., at 658; S. Rep. No. 97–417, p. 27 (1982) (Senate Report). An intent test, the Report stated, imposed "an inordinately difficult burden for plaintiffs." *Id.*, at 36. Even when state actors had purposefully discriminated, they would likely be "ab[le] to offer a nonracial rationalization," supported by "a false trail" of "official resolutions" and "other legislative history eschewing any racial motive." *Id.*, at 37. The proof lay in what had happened after *Bolden*, when even suits involving "egregious" vote dilution had failed. Senate Report, at 37; see *id.*, at 26–27, 37–39. And in any event, the Report continued, the *Bolden* intent test "ask[ed] the wrong question." Senate Report, at 36. The right question was instead the one *White*—and now the statute—asked: "whether minorities have equal access to the process of electing their representatives." Senate Report, at 36. In applying the new Section 2, the Report instructed, courts should "assess the impact of the challenged" practice based on "objective factors" to determine whether it worked to "minimize or cancel out the voting strength and political effectiveness of minority groups." *Id.*, at 27–28.

The Senate Report also noted this Court's holdings recognizing Congress's constitutional authority to focus the Section 2 standard on results. It is "hornbook law," the Report explained, that the Fifteenth Amendment "grant[s] Congress broad power" to enact legislation "reasonably adapted to protect citizens against the risk" that their constitutional right to vote will be denied. *Id.*, at 39–40 (citing *Katzenbach*, 383 U. S., at 326). So even though the Fifteenth Amendment itself barred only intentional discrimination, Congress could enact legislation extending to

discriminatory effects. Indeed, the Report observed, this Court had held as much two years earlier, when it approved Section 5's broad effects-based scope. Senate Report, at 40 (citing *City of Rome*, 446 U. S. 156). In Section 2 as well, proper enforcement of the Fifteenth Amendment necessitated a results test. For one thing, voting rules with "discriminatory results perpetuate the effects of past purposeful discrimination." Senate Report, at 40. And anyway, the Report again emphasized, the difficulties of proving motive would "create a substantial risk that intentional discrimination" would go "undetected, uncorrected and undeterred." *Ibid.*

So Congress made a choice that was "as considered as considered comes": to ensure that "results alone could lead to liability" under Section 2. *Brnovich*, 594 U. S., at 703 (KAGAN, J., dissenting). Congress in 1982 knew all about this Nation's history of racially discriminatory voting practices. It knew that even when States could no longer deny ballots to minority citizens, they might still try to give their votes no or minimal weight. And Congress knew that those efforts did not come tagged as race-based. To the contrary, they were race-neutral on their face, and likewise were publicly backed by race-neutral justifications. So Congress renounced, as strongly as it could, *Bolden*'s decision to limit Section 2's ban to intentional discrimination. It made sure instead, as this Court recently explained, that Section 2 would "turn[] on the presence of discriminatory effects." *Allen*, 599 U. S., at 25; see *id.*, at 44 (KAVANAUGH, J., concurring in part) ("[T]he text of §2 establishes an effects test, not an intent test"). And more precisely, that the section would turn on whether, given all relevant circumstances, an electoral rule would leave minority voters with "less opportunity" than non-minority voters to "elect representatives of their choice." §10301(b).

There is a way to decide this case consistent with that fully permissible congressional choice, and a way not. In

the next part, I show how 40 years' worth of this Court's caselaw would address the vote-dilution claim involved here. After that, I address what today's majority does.[2]

## II

This Court first construed the amended Section 2 in *Thornburg* v. *Gingles*, establishing there a framework—like the new statute itself—based on *White*. That framework has governed vote-dilution claims for the last four decades. And indeed, just three years ago, in *Allen*, we unequivocally reaffirmed it when sustaining a vote-dilution challenge to an Alabama redistricting scheme. See 599 U. S., at 19–23. Had we proceeded along the same road today, we would have treated the vote-dilution challenge to Louisiana's scheme in the same way.

"*Gingles* began," as *Allen* recently noted, "by describing what §2 guards against." 599 U. S., at 17. "The essence of a §2 claim," *Gingles* explained, is that an electoral rule or practice "interacts with social and historical conditions," generally caused by past intentional discrimination, "to cause an inequality in the opportunities enjoyed by black and white voters." 478 U. S., at 47. Such an inequality exists when the challenged rule "operates to minimize or cancel out [minority voters'] ability to elect their preferred

---

[2] A wrinkle here is that the suit directly before us involves a claim of racial gerrymandering under the Fourteenth Amendment, not of vote dilution under Section 2. See *ante*, at 16–17. (As I will later discuss, the elements of the two have always been poles apart—with a dilution claim turning on an election rule's effects and a gerrymandering claim turning on its purpose. See *infra*, at 26–27, and n. 6). But this gerrymandering suit arose out of a prior dilution suit's success: The plaintiffs here attack the districting plan that Louisiana devised to remedy the vote dilution previously found. See *ante*, at 12–17. And the majority chooses to resolve this suit by focusing on the earlier one—holding that the plaintiffs here succeed because the court in the earlier litigation did not apply the majority's brand-new understanding of Section 2. See *ante*, at 32–35. So I too focus on how to decide a vote-dilution claim under Section 2, and do not address other issues implicated in a gerrymandering suit.

candidates." *Id.*, at 48. And the risk of that "mini-miz[ation]"—or dilution—is greatest when "minority and majority voters consistently prefer different candidates" and the minority voters are submerged in a majority voting population that "regularly defeat[s] [their] choices." *Ibid.*; see *Allen*, 599 U. S., at 17–18.[3]

To get at that issue, *Gingles* initially requires a Section 2 plaintiff asserting vote dilution to satisfy three "precondi-tions." 478 U. S., at 50. First, the minority group allegedly harmed must be "sufficiently large and geographically com-pact to constitute a majority in a reasonably configured dis-trict"—meaning, one "comport[ing] with traditional dis-tricting criteria." *Allen*, 599 U. S., at 18 (alteration omitted). Second, the identified minority group must be "politically cohesive," meaning that its members mainly vote for the same parties or candidates. *Gingles*, 478 U. S., at 51. And third, the majority in the district must "vote[] sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Ibid.* Those three factors, taken together, serve a gatekeeping function. They permit a vote-dilution suit to proceed only if a plaintiff can show that minority voters would elect a "representative of [their] own choice" in some reasonably drawn electoral district, but

───────────

[3] The majority, in describing the legal background to this case, briefly criticizes our *Gingles* opinion for spending too little time with Section 2's text and too much with the Senate Judiciary Committee Report. See *ante*, at 7. The author of today's decision made the same point in *Allen*— in his then-dissenting opinion. See 599 U. S., at 103 (opinion of ALITO, J.). But the erstwhile majority there rejected the argument, explaining that, whatever changes have occurred in statutory interpretation, "*Gin-gles* effectuates the delicate legislative bargain that §2 embodies." *Id.*, at 39, n. 10. It does so, as will soon become evident, by grounding its framework in Section 2's ban on electoral rules that, in all the circum-stances, "result[] in" giving minority voters a "less[er] opportunity" than others to "elect representatives of their choice." §10301. And it does so, too, by relying on (indeed, partly copying) this Court's analysis in *White*—which was the indisputable basis for Senator Dole's textual com-promise. See *Allen*, 599 U. S., at 12–13; *supra*, at 14–15.

that racially polarized voting in the district as actually drawn will usually "impede[] [their] ability" to do so. *Allen*, 599 U. S., at 18; *Gingles*, 478 U. S., at 51.

That threshold test is not easily met. To satisfy the first factor, a plaintiff will have to suggest alternative districting plans complying with such traditional criteria as compactness, contiguity, and respect for geographic boundaries and political subdivisions. And as *Allen* recently described, the inability to offer such substitute maps has doomed a good many vote-dilution suits. See 599 U. S., at 27–29 (citing *Shaw* v. *Reno*, 509 U. S. 630 (1993); *Miller* v. *Johnson*, 515 U. S. 900 (1995); *Bush* v. *Vera*, 517 U. S. 952 (1996); *Abbott* v. *Perez*, 585 U. S. 579 (2018)). Similarly, to satisfy the second and third conditions, the plaintiff must show the existence of racially polarized voting, generally through "statistical evidence of historic voting patterns." *League of United Latin American Citizens* v. *Perry*, 548 U. S. 399, 500 (2006) (ROBERTS, C. J., concurring in part and dissenting in part). It is never enough in a Section 2 suit to rely on "assumptions" about how individuals will "vote based on their ethnic [or racial] background." *Ibid.* Instead, "plaintiffs must prove" racial bloc voting. *Gingles*, 478 U. S., at 46. Given those requirements—and the steady decline in both residential segregation and racially polarized voting, which make them harder to meet—only strong vote-dilution claims can today get out of the gate. See Brief for Ellen D. Katz et al. as *Amici Curiae* 7–8 (Katz Brief); *Allen*, 599 U. S., at 26–29; *infra*, at 43–44.

And beyond *Gingles*'s preconditions lies the "totality of circumstances" inquiry that migrated from *White* to Section 2's text. §10301(b); see *supra*, at 14–15. To find, under that test, that the political process is not "equally open" to minority voters, a court must make (so *Gingles* held, lifting from *White*) "an intensely local appraisal" of how the challenged electoral rule operates against the backdrop of "past and present [racial] realit[ies]." §10301(b); *Gingles*, 478

U. S., at 79; see *White*, 412 U. S., at 769. The "objective factors" to be considered include the State's "history of voting-related discrimination," its experience of "racial appeals in political campaigns," and its track record of electing minority citizens to office. *Gingles*, 478 U. S., at 44–45; see *White*, 412 U. S., at 769; Senate Report, at 28–29. So too, the inquiry may involve appraising the "effects of past discrimination" on economic and social conditions that "hinder [minority citizens'] ability to participate effectively in the political process." *Gingles*, 478 U. S., at 45; see *White*, 412 U. S., at 768. Equally, though, the totality test weighs the strength of a "State's interest in maintaining" a given electoral practice. *Houston Lawyers' Assn.* v. *Attorney General of Tex.*, 501 U. S. 419, 426 (1991). And the variety of matters to be assessed does nothing to detract from the test's bite. By digging deep into local context, the totality inquiry implements Congress's directive that a simple lack of proportional representation cannot make out a Section 2 claim. See *Allen*, 599 U. S., at 26–30. And when superimposed on *Gingles*'s threshold conditions, the test ensures that Section 2 will work as intended: to limit liability to cases where electoral rules in fact "deny minority voters equal opportunity" in the political process. *Allen*, 599 U. S., at 30 (alteration omitted).

Understood in that way, *Allen* explained just three years ago, "*Gingles* has governed our Voting Rights Act jurisprudence since it was decided." *Id.*, at 19. More: "Congress has never disturbed our understanding of §2 as *Gingles* construed it." *Ibid.* And more: "[W]e have applied *Gingles* in one §2 case after another, to different kinds of electoral systems and to different jurisdictions in States all over the country." *Ibid.* (citing no fewer than 10 Supreme Court decisions). And yes, still more, this time invoking "*stare decisis*": "[W]e decline to adopt an interpretation of §2 that would revise and reformulate" the *Gingles* framework "that has been the baseline of our §2 jurisprudence for nearly

forty years." *Id.*, at 26, and n. 3.　One might even have thought the matter settled.　But see *ante*, at 1–37.[4]

In that settled view, a paradigmatic case of a Section 2 violation is the cracked-circle hypothetical opening this dissent.　See *supra*, at 1–2.　If you refresh your memory, you'll instantly see why.　The Black electorate could form—indeed, did form—a reasonably configured district: The circle in the middle of the State complies with traditional districting criteria of contiguity, compactness, and respect for political subdivisions.　So *Gingles*'s first precondition is met. And the racially polarized voting in the State ensures that the second and third are met as well.　The Black electorate within the circle and the White population surrounding it vote as blocs and for different candidates.　So when the Black voters are dispersed among six predominantly White districts, they lose all their electoral influence.　Or, as we recently described such a situation: Black voters have "the potential to elect a representative of [their] own choice in a possible district," but "racially polarized voting prevents [them] from doing so in the district as actually drawn because [they are] submerged in a larger white voting population." *Cooper* v. *Harris*, 581 U. S. 285, 302 (2017) (alteration omitted).　That means a Section 2 suit will be decided

---

[4] The majority's view that *Allen* "did not address the central issue here," *ante*, at 31—the meaning of Section 2 and appropriate content of the *Gingles* framework—is one of the more perplexing aspects of today's decision.　I will have more to say about that assertion below, see *infra*, at 35–37, 39, n. 11, but for now, I invite readers to do a bit of exploration on their own.　Just search for every quotation from *Allen* in this opinion— in this paragraph of course, but all the rest too—and ask yourself whether it is credible that *Allen* "did not address" the question of "our understanding of §2 as *Gingles* construed it." *Ante*, at 31; *Allen*, 599 U. S., at 19.　Better yet, go read all of *Allen*.　You will find that, on page after page, it discusses precisely that issue—and offers a reading of Section 2 and *Gingles* perfectly consonant with this dissent, and fundamentally at odds with today's majority opinion.　See, *e.g.*, *Allen*, 599 U. S., at 11–14, 17–19, 24–30, 37–38, 39, 41; *id.*, at 30–33 (plurality opinion).

based on the totality of the circumstances. And, as to that, I have posited facts making the inquiry straightforward: Recall that the hypothetical State has a long history of racial discrimination, which continues to show up, in manifold ways, in social conditions and political activity. So Section 2 (before today) would have stopped the hypothesized cracking plan and, in so doing, worked as Congress intended—to give Black voters no less a chance than their White neighbors to participate in the political process and elect their preferred representatives.

And my hypothetical is not so different from the Louisiana districting scheme that was challenged in the dilution suit underlying this case. It is just that instead of arguing about the need for one majority-minority district, the plaintiffs in that suit were asserting the need for a second. As the majority relates, Louisiana drew its post-2020 census map with one mainly Black district and five mainly White ones. See *ante*, at 11–12. (For context, Louisiana's population is about one-third African American.) The dilution plaintiffs alleged that there was another natural (*i.e.*, politically cohesive and geographically contiguous) Black-majority district which the Louisiana Legislature had effectively cracked. See *ante*, at 15 (showing the plaintiffs' proposed district). The residents of that possible district wound up dispersed among the State's other districts, where (given racially polarized voting) their preferences would count for nothing. According to the plaintiffs, that plan violated Section 2 by giving Black voters less opportunity than their White counterparts to elect representatives of their choice.

Based on a voluminous record, including mountains of statistical data and five days of testimony, the District Court found that the plaintiffs were likely to prevail. See *Robinson* v. *Ardoin*, 605 F. Supp. 3d 759, 766 (MD La. 2022). Their proposed second district—in which Black voters could "easily" form a majority—was reasonably configured according to traditional districting criteria. *Id.*, at

821; see *id*., at 827–831. And without that district, Black voters' choices would be swamped: The evidence showed that as few as 12% of White voters in Louisiana would support Black-preferred candidates in statewide contests. *Id*., at 841–842. With the *Gingles* preconditions thus satisfied, the court assessed the totality of the circumstances and found that it, too, supported relief. See, *e.g.*, 605 F. Supp. 3d, at 845 (recounting, among other things, the State's long history of racial discrimination, including that "Louisiana has never had a Black Congressperson elected from a non-majority-Black district"). And so the court ordered the State to draw a new map.

The court thus applied, in an altogether unexceptionable way, the framework used for the last 40 years to evaluate Section 2 vote-dilution claims. The court followed *Gingles*, along with the two fistfuls of this Court's decisions affirming its framework. See *supra*, at 20–21. And most crucially, the court followed Section 2 itself, because all our prior decisions faithfully implemented the fundamental choice Congress made in amending that section: to make liability turn (as the Court did in *White*) not on the motives behind but on the "results" of an electoral practice like districting.

## III

The majority today does just the opposite. Under the guise of "updat[ing]" the *Gingles* framework, *ante*, at 26, 29, 32, the majority transforms it—and in so doing, betrays Congress's choice. At each of *Gingles*'s steps, the majority imposes new proof requirements, serving a common objective: to convert an effects test, as commanded by Congress, into a purpose test, as preferred by this Court. Nearly half a century ago, Congress amended Section 2 to repudiate *Bolden*'s limitation of that provision's reach to intentional discrimination. See *supra*, at 13–16. Today's decision returns Section 2 to what it was under *Bolden*. Now, as then, vote-dilution plaintiffs will have to show more than vote

dilution: They will have to show, as well, race-based motive. Now, as then, that requirement will make success in their suits nearly impossible, even if an electoral practice has in fact "minimize[d] or cancel[ed] out" minority citizens' "voting strength." *Allen*, 599 U. S., at 25 (quoting *Gingles*, 478 U. S., at 47). It is as if Congress had never amended Section 2. I first show how that is the consequence of today's "updating"; I then address how the majority attempts to justify what it has done. The upshot is that the majority, without any good reason, has overturned Congress's studied determination—along with this Court's precedents upholding it—about how to rectify racial inequalities in electoral politics.

## A

Let's first drop the majority's misleading label. What the majority gives us today is not an "updated *Gingles* framework." *Ante*, at 32. It is its own thing, deserving of its own name. Maybe the *Callais* contrivance? Or if that seems too immediately pejorative, just say that what the majority does today is to impose the *Callais* requirements.

At their base, all those requirements have the same function: They force a vote-dilution plaintiff to prove that a State adopted an election rule with racially discriminatory intent. On the majority's view, a rule diluting minority votes—even making them count for nothing—poses no problem if motivated by "nonracial factors." *Ante*, at 24. So a State has free rein to "use traditional districting factors" even when they minimize or cancel out minority votes. *Ibid.* And yet more practically important, a State may (so says the majority) draw districts for any political purpose, including for a purely "partisan purpose[]"—that is, to increase one party's electoral strength—no matter their racial effects. *Ante*, at 25. For that reason, the majority insists, a Section 2 plaintiff has "a special burden to overcome." *Ibid.* (quoting *Alexander* v. *South Carolina State Conference of*

*the NAACP*, 602 U. S. 1, 9 (2024) and *Cooper*, 581 U. S., at 308). The plaintiff "must disentangle race from politics by proving that the former drove a district's lines." *Ante*, at 25 (quoting *Alexander*, 602 U. S., at 9, and *Cooper*, 581 U. S., at 308; emphasis deleted). In other words, he must show that the State, in drawing that district, had not a political but instead a racial motivation—that it acted for the specific purpose of weakening a minority group's voting influence. The new *Callais* requirements, as I'll soon discuss, are all (concededly) designed to ensure that the plaintiff is held to that "special burden"—which, as the Congress amending Section 2 well understood, is nearly insuperable.[5]

―――――――

　[5] In responding to this dissent, the majority (on its opinion's penultimate page) appears to disclaim this reading. The majority notes first (and this is true enough) that "the dissent states over and over again that our decision requires a §2 plaintiff to prove discriminatory intent." *Ante*, at 35. And then the majority's response: No, a vote-dilution plaintiff need show only that a redistricting "denies members of a racial group the same 'opportunity' as other voters to elect the candidates they prefer." *Ibid*. That formulation is right, and as shown above, it demands an inquiry into the *effects* of a scheme on voters' opportunity to elect candidates. See *supra*, at 14–15, 17–22. Similarly, the majority claims that it is doing just what *White* did. See *ante*, at 35. And *White*, recall, made an "intensely local appraisal" of whether an electoral scheme, when "overlaid" on historical, social, and political "realities," in fact operated to dilute minority voting strength—in other words, applied an effects test. See *supra*, at 10–12, and n. 1. So the majority closes its opinion by suggesting it is *not* requiring a vote-dilution plaintiff to present evidence of "discriminatory intent." *Ante*, at 35. Which, if true, would be welcome news. And welcomer still if lower courts took those last words seriously and allowed Section 2 claims to succeed even absent proof of race-based purpose. But I suspect they will not. Because they, like I, will have read the many pages leading up to the majority's coda. And those pages, both in setting out and in explaining the *Callais* requirements, make clear that a Section 2 plaintiff has a "special burden" to "demonstrate" that racial rather than political (or other) reasons "drove a district's lines"—*i.e.*, that "the State *intentionally* drew its districts to afford minority voters less opportunity." *Ante*, at 25–26, 29 (emphasis added). So what the majority hopes to accomplish by its last-minute attempt to associate itself with an effects inquiry is something of a mystery. To try to disguise what it is

But before becoming so granular, it is worth asking what precedents support the majority's insistence on evidence of racially discriminatory intent. By now, I hope, no reader will think those precedents concern Section 2. Our Section 2 precedents are quite to the contrary: It is "patently clear," *Allen* recently summarized, that because Section 2 liability "turns on the presence of discriminatory effects, not discriminatory intent," a plaintiff need not demonstrate a "purpose of racial discrimination." 599 U. S., at 25 (quoting *Gingles*, 478 U. S., at 71, n. 34). So the majority must go further afield. Its citations regarding the plaintiff's "special burden" of showing that race rather than politics (or anything else) motivated the State are from this Court's racial-gerrymandering jurisprudence. See *ante*, at 25 (citing *Alexander* and *Cooper*). But racial gerrymandering claims and vote-dilution claims are, despite some superficial similarities, different legal beasts. Contra, *ante*, at 36 (confusing and conflating the two). Plaintiffs bringing the former need not have suffered vote dilution, nor do they invoke Section 2. Their claim is simply that purposeful racial sorting—all on its own, irrespective of any vote-minimizing effects—violates the Fourteenth Amendment.[6] In such a case

––––––––––

really doing? To somehow absolve itself of responsibility? Or could it just be that, in responding to this dissent, the majority can do nothing but agree?

[6] The first case to recognize a racial gerrymandering claim was *Shaw* v. *Reno*, 509 U. S. 630 (1993). There, five White residents objected to the North Carolina Legislature's decision to create two majority-Black districts. But the plaintiffs did not—and could not—argue that the map diluted their votes. See *id.*, at 641. Instead, they contended that the legislature's "deliberate [race-based] segregation of voters" violated their Fourteenth Amendment right to "a color-blind electoral process." *Id.*, at 641–642. The Court held that the plaintiffs had a "cognizable claim"— that the Fourteenth Amendment could be violated by such intentional sorting. *Id.*, at 634. And later decisions elaborated that a racial gerrymandering claim would trigger strict scrutiny if a plaintiff "prove[d] that race was the predominant factor motivating" the drawing of district lines. *Cooper* v. *Harris*, 581 U. S. 285, 291 (2017).

(as I have elsewhere explained), it is of course essential to have proof of race-based purpose. See *Cooper*, 581 U. S., at 291–292, 308. But not so when the claim is for vote dilution, brought under a statute that (in *Allen*'s words again) "clearly rejected treating discriminatory intent as a requirement for liability." 599 U. S., at 37. In that context, putting a burden on the plaintiff to show that district lines were "driven by" racial rather than political (or other) factors, *ante*, at 29, is to reject everything this Court has ever said about Congress's Section 2 choice.

The majority's misplaced focus on purpose shows up first, and most critically, in its recasting of the first *Gingles* precondition. That threshold requirement, as the majority acknowledges, has always functioned to ensure that a minority community is large and geographically compact enough to elect a representative of its choice in a reasonably configured district. See *ante*, at 8, 29; *supra*, at 18–19. So the illustrative maps most vote-dilution plaintiffs submit show exactly that—how a reasonable majority-minority district could be created. But now, the majority says, the first precondition must be devoted to flushing out discriminatory purpose on the part of the State, by excluding the possibility that its districting plan arose from nonracial motives. See *ante*, at 29–30. So the plaintiffs' alternative maps have to satisfy (as well or better than the State's own) every permissible districting criterion the State specifies, including—and this is the kicker—all its "political goals." *Ibid.* Those goals include the "partisan distribution" of districts within the State—say, that six seats should be held by one party and none by the other. *Ibid.* Likewise, they apparently encompass the partisan balance within any district— say, to ensure "a specific margin of victory" for a candidate. *Ibid.* Only if the plaintiffs' maps "achieve [all those] goals just as well" as the State's plan, the majority intones, can those maps "help to 'disentangle race' from politics"—or, otherwise said, show that the State's plan was "driven by

racial" motives. *Ibid.* (quoting again *Alexander*, 602 U. S., at 6—a racial gerrymandering, not Section 2 dilution, case).

That change alone is likely to bring vote-dilution suits (already hard to win) to a screeching halt. To see how, return to the circle hypothetical—until now, the paradigmatic case of vote dilution, because the State there prevents Black (but not White) voters from having an opportunity to elect their preferred representative, as Section 2 demands. See *supra*, at 1–2. The legislature, recall, has sliced the majority-Black circle district into six pie pieces, with each added to (and only marginally affecting) a predominantly-White district. Before today, the first *Gingles* precondition is met with ease, just with a picture of the old district: Yes, that picture would say, Black voters can form—in fact, have formed—a majority in a district drawn consistent with traditional principles. See *supra*, at 21. But after today? Suppose the State, per the majority's instructions, asserts that it cracked the African American electorate because it wants six safe Republican districts. Now the plaintiffs' illustrative map, insists the majority, must also have six safe Republican districts. But given that race and partisan preference are linked (with Black citizens mainly voting Democratic), such a map cannot be drawn. Any map with a majority-Black district will not be a map with all Republican seats. And so, the majority decides, a Section 2 suit must fail at the outset—even though the State has deprived Black citizens of any opportunity to elect representatives of their choice. At least where such common race-based voting patterns hold, States now have an automatic political-gerrymandering defense to vote-dilution claims.

Yet more, the majority's reworking of *Gingles*'s first precondition (contra its assurance) will doom vote-dilution suits even when majority and minority voters support different candidates *within a single party*. Take an example offered by the Solicitor General, whose ideas about how to upend *Gingles* the majority largely filches. See Brief for

United States as *Amicus Curiae* 20–31. In that hypothetical, Black, Hispanic, and White voters residing in Harlem all vote mainly for Democrats, but have "different candidates of choice." Tr. of Oral Arg. 119. The Solicitor General maintains that if the district lines "favor[] one of those racial groups"—let's say, the Black voters—"that's the sort of situation where Section 2 could come in." *Ibid.* The majority agrees, because there the State's preference for one party could not explain the district lines drawn. See *ante*, at 27, 29–30. But under the majority's test, the legislature could easily invoke other political, as well as non-political, goals to justify the lines and thus preclude liability. Suppose the State asserted that it drew the lines to protect an incumbent, who just so happened to be favored by Black residents. Or suppose the State said it wanted to increase (or decrease or maintain) the district's partisan competitiveness (created by its ratio of Democrats to Republicans), which just coincidentally gave Black voters more influence. Or suppose the State said that it wished to keep the existing district's core intact (itself a frequent districting criterion, see *ante*, at 24), rather than make the changes needed to give non-Black voters greater electoral opportunity. The possibilities are endless. And each would have the same result. Because a Section 2 plaintiff's map could not as well advance the bespoke political (or other) goal(s) favoring the Black voters' chosen candidate, the suit would fail—even if non-Black votes, election year in and election year out, had been made to count for nothing.

Congress, as should by now be clear, made a different choice. In amending Section 2, Congress opted for the effects test of *White* over the purpose test of *Bolden.* See *supra*, at 13–16. And it did so largely because of the unfeasibility of countering a State's non-race-based justification for a given districting decision. See *supra*, at 15–16. Such a demand, the authors of the Senate compromise explained, would impose "an inordinately difficult burden," precluding

a remedy for even the most "egregious" cases of vote dilu-
tion. Senate Report, at 36–37. Yet that is exactly the bur-
den the majority makes Section 2 plaintiffs bear—and at
the first threshold condition. The majority makes no effort
to explain how minority voters can meet its new require-
ment. How they can devise a map satisfying (at least as
well as the State's own) each of the State's asserted political
and other goals while *also* creating (or maintaining) a ma-
jority-minority district.[7] Or assuming they cannot draw
such a map, whether they may produce other evidence of
racially discriminatory motive to meet (or else bypass) the
first *Callais* requirement. Or if they may offer such evi-
dence, how (if at all) it might differ from the kind generally
needed to prevail in a racial gerrymandering suit—*i.e.*, "di-
rect evidence," like "leaked e-mails" from legislators pro-
fessing the desire to reduce a racial group's voting strength.
*Alexander*, 602 U. S., at 8. Presumably, the majority thinks
that the details do not much matter. Once Section 2 has
been transformed, via a change to *Gingles*'s first

———————

[7] If that assignment does not sound fanciful enough, the majority im-
poses yet a weirder requirement on plaintiffs' maps—and one *Allen* spe-
cifically rejected. "[I]n drawing illustrative maps," today's majority
holds, "plaintiffs cannot use race." *Ante*, at 29; see *ibid.* ("[A]n illustra-
tive map in which race was used has no value in proving a §2 plaintiff's
case"). What exactly the majority means by "use" is left unclear. But
assuming the majority means to bar plaintiffs from taking account of
race when showing how a majority-*minority* district could be created, it
is both incoherent and inconsistent with Section 2 and *Gingles*. I cannot
do better than *Allen* did in explaining why. In that case, Alabama took
much the view the majority does: that a Section 2 plaintiff's illustrative
maps "cannot have been 'based' on race." 599 U. S., at 24. But *Allen*
spurned the notion. "Section 2 itself demands consideration of race," we
explained, because its implementation requires knowing "whether addi-
tional majority-*minority* districts can be drawn." *Id.*, at 30–31 (emphasis
in original). And indeed, we continued, "[t]hat is the whole point" of the
maps "adduced at the first step of *Gingles*." *Id.*, at 33 (emphasis deleted).
To say that those maps must be "race-blind" is thus to "reject [the *Gin-
gles*] framework outright"—really, to insist that it "be overruled." *Ibid.*
Quite right.

precondition, from a ban on racially dilutive effects (à la *White*) to a ban on race-based motives (à la *Bolden*), virtually all vote-dilution cases will fail anyway. The majority has thus nullified Congress's decision to provide a remedy, without proof of intent, for state action that "results in" a minority group's lesser opportunity "to elect representatives." §10301.

But the majority is not yet done thwarting Congress's objective. Maybe in some exceptional case, a State will fail to assert a goal, like political gerrymandering, that the plaintiff's map cannot replicate. Then, the majority's makeover of the second and third *Gingles* preconditions comes into play, again to convert Section 2 into its opposite—a statute turning on discriminatory intent, not effects. Contra, *Allen*, 599 U. S., at 25 ("§2 turns on the presence of discriminatory effects, not discriminatory intent"). Until today, the second and third preconditions focused simply on racially polarized voting: Plaintiffs had to show that minority citizens vote cohesively, but cannot elect their preferred candidates because majority citizens vote as a bloc for others. See *supra*, at 18–19. Now the majority introduces a new requirement to impede Section 2 suits: "[T]he plaintiffs must provide an analysis that controls for party affiliation." *Ante*, at 30. That means if minority citizens vote mainly for one party and majority citizens vote mainly for another, none of that difference can count toward meeting the second and third preconditions. So in offering evidence of polarized voting preferences, a plaintiff must remove from the equation . . . polarized voting preferences. For in most places (even if not in Harlem), partisan difference is the way those divergent preferences are expressed—and the way one racial group's vote can swamp another's, again and again. The majority argues that its new requirement is needed to rule out the possibility that the State districted as it did for partisan, rather than racial, reasons. See *ibid.* But the State's intent is not what is supposed to matter in a Section 2 suit.

Congress amended Section 2 (need I say again?) to ensure that it would function as an effects test. The majority wishes a different statute, and makes it so.[8]

And so too for Section 2's "totality of circumstances" inquiry. §10301(b). Should some litigant miraculously arrive at that stage of a vote-dilution suit, he will find it transformed. The "totality" test, today's majority insists, must focus on only one thing: "intentional present-day voting discrimination." *Ante*, at 31. But that is neither what Congress said nor what Congress meant when it added the phrase "totality of circumstances"—obviously referring to multiple things—to Section 2. See *Allen*, 599 U. S., at 26 (A "single-minded" concentration on "only one circumstance[]" "cannot be squared with [Section 2's] demand"). Derived from *White*, that phrase demands the kind of "intensely local appraisal" the Court there used to evaluate a districting plan's "impact" on a minority group's access to the political process. 412 U. S., at 769–770. That appraisal of course included evidence relating to "intentional present-day voting discrimination." *Ante*, at 31. But it included as well the continuing effects of past discrimination—and not only in politics but in other spheres of life. See *White*, 412 U. S., at 767–769; *supra*, at 11–12. The majority's flattening of the prescribed inquiry mirrors *Bolden*'s conversion of *White* into a test for illicit motive. See *supra*, at 12–13. But it was precisely to reverse that shift that Congress enacted Section 2's current "totality" language.

—————

[8] As with the first *Callais* requirement, see *supra*, at 30–31, the majority does not address whether plaintiffs can bypass this second requirement if they have evidence that the districting decision was "driven by racial considerations," *ante*, at 29. In other words, what happens if the second *Callais* requirement is unsatisfied (because race and partisan preference go hand in hand) but there is still evidence that race "drove" the "district's lines"? *Ante*, at 25, 36. Presumably the claim should be able to proceed to the "totality" test, but the majority leaves us guessing.

The consequences of the new *Callais* requirements show up immediately, in the majority's disposition of this case. The District Court may have heard five days of testimony; may have properly applied the (old) *Gingles* factors; may have explained in 110 fact-intensive pages why the vote-dilution plaintiffs were likely to prevail. See *supra*, at 22–23. But the majority thinks it "eas[y]" to overturn all that court's work in a few paragraphs. *Ante*, at 32. The plaintiffs flunked the (new) first *Gingles* precondition because their illustrative map, although showing a reasonably configured majority-minority district, "fail[ed] to meet the State's political goal[]" of protecting every incumbent Republican Representative. *Ante*, at 33. The plaintiffs came up short on the (new) second and third preconditions because their showing of racially polarized voting—"that black and white voters consistently supported different candidates"—"did not control for partisan preferences." *Ante*, at 34. And anyway, the plaintiffs could not prevail under the (new) "totality of circumstances" test because they did not show "that the State's challenged map was the result of intentional racial discrimination"; all the plaintiffs' evidence—like the dearth of Black-preferred candidates ever elected in the State—could just be the result of "politics." *Ante*, at 34–35. Bang, bang, bang. It is like shooting fish in a barrel. Once the State can rely on any political goal of its devising—and once "inter-party racial polarization" serves to "undercut" rather than "strengthen[]" a vote-dilution claim—no plausibly existing evidence in this case could have made a difference. *Ante*, at 30, 34 (emphasis deleted).

And nothing is special about *this* majority-minority district; as the *Callais* requirements have eliminated it today, so they will eliminate other and older ones in the years to come. Recall that this majority-Black district (which is District 6) was Louisiana's second. See *supra*, at 22–23. The State's District 2 has had a Black majority since 1983, when a vote-dilution suit forced its creation. If Louisiana were

tomorrow to slice up District 2, dispersing its Black residents among the rest, it is hard to see how the now judicially amended Section 2 could stand in the way. The State presumably would assert as its "political goal" an all-Republican congressional delegation; in other words, it would announce a partisan gerrymander. *Ante*, at 25, 33. And because of the severe racial polarization in the State, that goal would be incompatible with maintaining District 2 as is. So those advocating for its majority-minority composition would almost surely lose at the first *Callais* requirement (and, as above, at the others as well). Repeated often enough across the country, the same districting practice— really, hinging only on the partisan ambitions (or restraint) of state legislatures—could destroy most of the majority-minority districts that in the past 40 years the Voting Rights Act created. The *Callais* requirements have thus laid the groundwork for the largest reduction in minority representation since the era following Reconstruction. Under cover of "updat[ing]" and "realign[ing]" this greatest of statutes, *ante*, at 29, the majority makes a nullity of Section 2 and threatens a half-century's worth of gains in voting equality.

B

There is only one "special burden" appropriate to deciding this case. *Ante*, at 25. And it is not the utterly novel one that the majority imposes on Section 2 vote-dilution plaintiffs to "disentangle" state motives. *Ibid.* Rather, it is the well-settled one that the Court itself must meet before overturning precedent about the meaning of a statute. Our law is clear. *Stare decisis*—the presumption that "today's Court should stand by yesterday's decisions"—"carries enhanced force" when the decision in question "interprets a statute." *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 455– 456 (2015). That is because our statutory, unlike our constitutional, rulings can always be changed by Congress

itself. See *id.*, at 456. (Just recall how Congress rejected our decision in *Bolden*.) When this Court has said what a statute means—and Congress has said nothing to the contrary—a "superpowered form of *stare decisis*" takes hold, which only a "superspecial justification" can overcome. *Id.*, at 458. Or, as one Justice has put it, there is in that circumstance a "nearly impregnable . . . shield" protecting the decision. *Minerva Surgical, Inc.* v. *Hologic, Inc.*, 594 U. S. 559, 579 (2021) (ALITO, J., dissenting).

This Court, as noted above, invoked that shield to uphold *Gingles* just three Terms ago. See *supra*, at 20–21. In *Allen*, Alabama proposed a way of limiting *Gingles* to make it harder to win a vote-dilution suit. We responded that "Congress is undoubtedly aware" of how this Court has construed Section 2. 599 U. S., at 39. And, we said, "[i]t can change that if it likes." *Ibid.* "But until and unless it does, statutory *stare decisis* counsels our staying the course." *Ibid.* (citing *Kimble*, 576 U. S., at 456); see also 599 U. S., at 42, 43, n. 1 (KAVANAUGH, J., concurring in part) (invoking "stringent statutory *stare decisis*" rules and noting that "[i]n the past 37 years" Congress "ha[s] not disturbed *Gingles*"). And if that's not enough (though why not?), then there's this. JUSTICE ALITO dissented in *Allen* in a way that prefigured today's opinion, proposing there that the *Gingles* framework be changed to reflect his own views about Section 2's text and constitutional context. See 599 U. S., at 103–104, 108–109; compare *ante*, at 20–26. The Court noted his argument that "[t]he *Gingles* framework should be [re]interpreted"—and then said no. 599 U. S., at 39, n. 10 (alterations in original). "[A]s we have explained," the Court stated, "*Gingles* effectuates the delicate legislative bargain that §2 embodies." *Ibid.*; see *id.*, at 17–19; *supra*, at 13–15. "And statutory *stare decisis*," the Court concluded, "counsels strongly in favor of not undoing" that "compromise." 599 U. S., at 39, n. 10 (alteration omitted). Apparently, though, statutory *stare decisis* is now done

"counsel[ing]," *id.*, at 39, and n. 10; it is not so much as men-
tioned in today's opinion.

That void is more remarkable still given *Allen*'s own re-
affirmation of *Gingles* on the merits (even putting aside its
precedential status). Just control-find for all my citations
of *Allen* (or better yet read the decision), and you will have
a good idea of its character. In addition to awarding *Gingles*
the highest form of *stare decisis* protection, *Allen* (1) traced
the history of Section 2's amendment as I have, focusing on
Congress's rejection of *Bolden*'s motive inquiry in favor of
*White*'s effects test, see 599 U. S., at 10–14; (2) explained as
I have how each part of the *Gingles* framework functions
and how the Court has used that framework "[f]or the past
forty years" "in one §2 case after another," 599 U. S., at 17–
19; (3) showed how the District Court's analysis (which
closely resembles the one here) conformed in all respects to
*Gingles*, see 599 U. S., at 19–23;[9] and (4) rejected the no-
tions that the *Gingles* framework should not apply to single-
member districting or that it violates the Fifteenth Amend-
ment, see 599 U. S., at 38–42; *infra*, at 41. The majority's
main claim for why *Allen* nonetheless has no relevance here
is that the decision "was about" Alabama's "specific argu-
ment" that a vote-dilution suit could succeed only if the
State's map deviated from a "race-neutral benchmark."
*Ante*, at 31. Well, sure, *Allen* was about that too. And in
rebuffing that argument, it used reasoning that equally dis-
credits the new *Callais* requirements.[10] But even put that

———————

[9] In that part of the opinion, the Court took note of JUSTICE THOMAS's
complaint that "what the District Court did here is essentially no differ-
ent from what many courts have done for decades under this Court's su-
perintendence." 599 U. S., at 26, n. 3 (dissenting opinion). The Court's
one-sentence response: "That is not such a bad definition of *stare decisis*."
*Ibid.*

[10] That is so because Alabama's proposed "race-neutral benchmark"
and the majority's *Callais* requirements operate on the same (mistaken)
logic. Alabama's premise in urging the benchmark's adoption was that
race-neutral reasons for districting should defeat a Section 2 suit; the

aside. The key point here is that at every step of its multi-step analysis, and in every part of its multi-part opinion, *Allen* reaffirmed *Gingles*—the old *Gingles*, with its old understanding of what Congress did when amending Section 2. So *Allen*, too, demands that today's majority, before mutilating *Gingles*, possess a "superspecial justification." *Kimble*, 576 U. S., at 458.

And it does not have one. Not a superspecial justification; not a special justification; not even an ordinary decent justification. On the statute's text, on the statute's constitutional context, and on "historical developments" post-dating the statute—the majority fails at every turn. *Ante*, at 26.

The majority's textual analysis is long and winding and, in its crucial move, wholly non-textual. The majority tells us it will interpret the phrase "less opportunity than other members of the electorate . . . to elect representatives of their choice." §10301(b); see *ante*, at 20. It then says a number of things, to no apparent effect, about the component terms "opportunity," "other members of the electorate," and "elect." *Ante*, at 20–21. And then, the majority puts all that aside and begins to free solo. See *ante*, at 21–22. What the provision promises minority voters, the majority says in the critical passage, is—and is only—"whatever opportunity results from the application of the State's

---

benchmark would show whether a districting plan in fact derived from such reasons, or instead from impermissible race-based ones. See *Allen*, 599 U. S., at 23–24; Brief for Appellants in *Allen* v. *Milligan*, O. T. 2022, Nos. 21–1086, 21–1087, pp. 43–46, 75. The *Callais* requirements are different in form but not in function: They too are designed to disentangle race-based from race-neutral (*e.g.*, partisan) reasons, on the (selfsame) view that Section 2 liability should attach only to the former. See *ante*, at 25, 29–30, 32. It is, then, not surprising that *Allen*'s primary ground for rejecting Alabama's benchmark also defeats the *Callais* requirements. *Allen* responded that "§2 turns on the presence of discriminatory effects, not discriminatory intent." 599 U. S., at 25. So it would not matter that the benchmark (and likewise the majority's alternative mechanism) suggested race-neutral motives.

combination of permissible criteria." *Ante*, at 22. Can you find that in the "less opportunity" phrase? What the majority means is that if the State has used non-race-based criteria (whether political or non-political) to draw its districts, then Section 2 has nothing to say. Even though those criteria produce a world (think about my cracked circle district) in which minority voters, compared to their White neighbors, have "less opportunity" to "elect representatives of their choice," a vote-dilution claim cannot prevail. §10301(b). That can only happen, according to the majority's view, when the district lines arise from "[im]permissible," race-based criteria—that is, when the State's evident intent was to strip minority voters of their opportunity to elect. *Ante*, at 22. With that interpretation in mind, read Congress's "less opportunity" phrase again. It is miles away.

And of course it is. Because, once more, the "less opportunity" standard was designed to focus on the "results" of a state practice, not on its justifications. §10301(a). Congress had seen again and again—when it amended Section 2 in 1982, had seen for over a century—how race-neutral election procedures, including in districting, could produce discriminatory results. See *supra*, at 7–8, 13, 15. Congress knew States did not have to rely on impermissible, race-based criteria to "minimize[] or cancel[] out [minority] voting strength." *Allen*, 599 U. S., at 25. So when this Court decided *Bolden*—which immunized race-neutral election procedures unless a plaintiff could produce smoking-gun evidence of discriminatory intent—Congress responded. It did not, as I've described, opt for proportional representation; it enacted a standard that would take some work to meet. See §10301; *supra*, at 19–20. But it most assuredly did not amend Section 2 to give minority citizens only "whatever" the "application of the State's combination of permissible" (*i.e.*, "nonracial") "criteria" produced. *Ante*, at 22, 24.

KAGAN, J., dissenting

So the majority must turn elsewhere, and it next lands on the Constitution. There, it begins in settled territory. The Fifteenth Amendment, all agree, prohibits only purposeful discrimination. See *ante*, at 23. But that amendment, in addition, grants Congress the power to enforce it by "appropriate legislation." Even the majority concedes that grant enables Congress to go further than the Amendment would—to prohibit things by legislation that the Amendment itself does not. See *ante*, at 22–23. The important issue is how far and how much. And here the majority makes an unprecedented claim. It contends that to "ensure" compliance with the Fifteenth Amendment, Section 2 must be construed to impose liability only when the circumstances create a "strong inference" of intentional discrimination. *Ante*, at 23. And more, the majority makes clear that the circumstances will not do so when the State can point to any remotely plausible race-neutral justification—whether political or non-political—for the district lines it has drawn. See *ante*, at 24 ("Properly understood," Section 2 "does not intrude on States' prerogative to draw districts based on nonracial factors"). That is so regardless of how discriminatory its districting is in operation—even to the point of "eliminating" in one fell swoop "all majority-minority districts." *Ante*, at 23.[11]

------

[11] Note that the majority's constitutional analysis is based only on the Fifteenth Amendment, and not at all on the Fourteenth. I would not ordinarily think to make that blazingly obvious point. But in a second attempt to distinguish this case from *Allen* (see *supra*, at 21, n. 4, for the first unsuccessful one), the majority insists that whereas "*Allen* did not discuss the Fourteenth Amendment," "[h]ere, by contrast, [the Fourteenth Amendment] is the linchpin of this suit." *Ante*, at 32. That is not so, at least in any way that matters to the majority's analysis. The Fourteenth Amendment serves as the entryway to that analysis, because the suit in fact before us presents a racial gerrymandering claim. But as I have described, the majority opts to decide that Fourteenth Amendment claim by focusing on the earlier Section 2 vote-dilution claim from which it arose. See *supra*, at 17, n. 2. The only Fourteenth Amendment

I just called that claim "unprecedented," and so it is: The majority has conjured it out of thin air. From before Section 2 was amended until today, Congress was understood to have constitutional power to ban practices resulting in unequal voting opportunities, irrespective of proof of racial motive. And likewise, Congress was understood to have power to prohibit vote-diluting practices even when a State could proffer some sort of plausible race-neutral justification. In this Court's seminal decisions, we explained that the phrase "appropriate legislation" in the Fifteenth Amendment grants Congress "the same broad powers expressed in the Necessary and Proper Clause." *Katzenbach* v. *Morgan*, 384 U. S. 641, 650 (1966); see *Katzenbach*, 383 U. S., at 325–327. So Congress has "discretion" to determine "whether and what legislation is needed to secure" the Amendment's "guarantees." *Morgan*, 384 U. S., at 651. And that discretion, as critical here, extends to "outlaw[ing] voting practices that are discriminatory in effect," without proof of intent. *City of Rome*, 446 U. S., at 173. In explaining why, this Court first underscored the connection between past discriminatory intent and present discriminatory results: Congress, we held, could decide that some unintentional state action works to "freeze the effect of past [purposeful] discrimination." *Id.*, at 176. And that was not all. Congress also could enact an effects test, we held, as the appropriate way of preventing current intentional discrimination—a sort of prophylactic rule responding to the "risk" (often made reality in American history) of a State's using ostensibly race-neutral practices to cover

―――――――
"holding" here is that a court may not draw race-based district lines without a compelling interest—something we have made plain many times before. See *ante*, at 8–11. The real work of the opinion is in deciding that compliance with Section 2 could not have given Louisiana a compelling interest because that provision, as construed today, did not require any change to the State's map. And that analysis is based only on Section 2 and the Fifteenth Amendment—exactly the subjects *Allen* covered.

impermissible goals. See *id.*, at 177; see also *Katzenbach*, 383 U. S., at 309, 335.

And if those decisions are too ancient for today's majority, it should consider (again) *Allen*, from three Terms ago. There, Alabama made an argument, similar to the majority's, that the effects-based framework of Section 2 and *Gingles* too far strayed from the Fifteenth Amendment's ban on intentional discrimination. We stomped on that objection. "[T]he prior decisions of this Court," we stated, "foreclose any argument that Congress may not, pursuant to §2 [of the Fifteenth Amendment], outlaw voting practices that are discriminatory in effect." 599 U. S., at 41; see *id.*, at 45 (opinion of KAVANAUGH, J.) ("[T]he constitutional argument presented by Alabama is not persuasive in light of the Court's precedents"). Section 2's "ban on electoral changes that are discriminatory in effect," we continued, "is an appropriate method of promoting the purposes of the Fifteenth Amendment." *Id.*, at 41. And if that were not enough, one final way of driving home the point: "[W]e are not persuaded" by the view that the "effects test" of Section 2 "as interpreted in *Gingles* exceeds the remedial authority of Congress." *Ibid.*

Those well-established precepts permit Congress to do what Congress did when it amended Section 2—prohibit electoral schemes based on their vote-diluting effects, regardless whether a State could offer up some race-neutral explanation. Congress then knew that it possessed such enforcement power; our decisions settling the issue were landmarks of the civil rights era. And Congress decided to use its authority. It did not make asserted state interests irrelevant: Those interests, indeed, had to be considered in the "totality of circumstances" inquiry Congress prescribed. §10301(b); see *supra*, at 20. But neither did Congress make those interests a nearly impregnable shield, as the majority does today. It understood, just as the Court had, that even race-neutral actions could perpetuate purposeful racial

discrimination.  And it realized, again in the same vein as the Court, that race-neutral explanations could conceal race-based intent.  See *supra*, at 15–16.  Today's majority makes plain its disdain for those views.  See *ante*, at 22–26.  But the Fifteenth Amendment gave the power to enforce its guarantees not to this Court but to Congress.

So the majority moves on again, now to a grab-bag of "developments" that it somehow thinks license it to rewrite a statute.  *Ante*, at 26–29.  The majority first summons the slogan of *Shelby County*, in which the Court ordained itself the arbiter of when civil rights laws are no longer needed.  "'[T]hings have changed dramatically,'" today's majority echoes, pointing to increases in African American voting registration and to the success of "'African-Americans attain[ing] political office'"—"particularly in the South, where many §2 suits arise."  *Ante*, at 26 (quoting *Shelby County*, 570 U. S., at 547, 553).  No doubt that is so, in large measure *because of* the Voting Rights Act.  But it is a separate question whether those gains will endure once the Act's protections are gone.  See *Shelby County*, 570 U. S., at 590 (Ginsburg, J., dissenting) (noting the fallacy of "throwing away your umbrella in a rainstorm because you are not getting wet").  And surely—but apparently not—the proper actor to answer that question is Congress.  For one thing, it likely has a fuller understanding of the issue.  I will be interested to see, for example, whether time will vindicate the majority's view that the "great strides" made in African American office-holding, "particularly in the South," will hold up after the issuance of this opinion.  *Ante*, at 26.  My own guess is not.  See *supra*, at 33–34.  But honestly, the American people pay no Member of this Court to make those predictive policy judgments—and more important, the Constitution does not allow us to base our decisions on them.  It is for the people's representatives in Congress to decide when the Nation need no longer worry about the dilution of minority voting strength.  So long as Congress has

not done so—and it has not—this Court has no right to cancel (sorry, "update") a duly enacted statute on the theory that it knows better.

Indeed, the majority's "things have changed" stance here is yet less defensible than in *Shelby County*. That is because Section 2, unlike the now-defunct Section 5, itself responds to change, so no external "fix" is needed. Section 5 selected jurisdictions for preclearance based on past conditions; so if the provision's last authorization was many years in the past, the mechanism could appear outdated. See *Shelby County*, 570 U. S., at 551 ("Coverage today is based on decades-old data and eradicated practices"). Section 2, by contrast, does not run on historical data. Liability attaches based only on present electoral practices and the present discrimination they "result[] in." §10301(a). A plaintiff must prove that the political process is "not equally open to participation" by all citizens *at the time of suit*; if he cannot, he loses. *Ibid.* There is thus no danger, as *Shelby County* put it, that "current burdens" are not "justified by current needs." 570 U. S., at 536. Under Section 2, they must be.

The *Gingles* preconditions yet further anchor Section 2 suits in the here-and-now by working as built-in sunset clauses. The first precondition is met only if a racial group is (in the present) geographically concentrated. See *supra*, at 18–19. That means as residential segregation decreases in a State, Section 2 becomes unavailable as a remedy. See *Allen*, 599 U. S., at 28–29. Similarly, the second and third preconditions can be satisfied only if voting (again, in the present) is racially polarized. See *supra*, at 18–19. So as racial bloc voting recedes, Section 2 ceases to operate. And racial desegregation and depolarization are not just possible in theory; they are happening in fact—and at speed—in many parts of the country. See Brief for Nicholas O. Stephanopoulos as *Amicus Curiae* 16–29. Consistent with those trends, the number of successful Section 2 vote-dilution

suits (always fairly small) has declined every decade since the statute was amended. Katz Brief 6. In short, as "things change dramatically," Section 2 self-liquidates—and to a fair extent, it already has. But in the places where, because of local conditions, the law continues to work, the Court has no warrant to speed its demise.

Nor is the majority aided by what it terms the emergence of a "full-blown two-party system" in "the States where §2 suits are most common." *Ante*, at 27. As to that development, the majority reiterates its persistent theme: When racially polarized voting expresses itself in different party preferences, district lines may reflect partisan rather than racial motives, and so Section 2 should drop out of the picture. See *ante*, at 27, 30, 32. But as an initial matter, the majority's newly formulated test will eliminate the lion's share of Section 2 claims even when racially polarized voting occurs within a single party—as in the Solicitor General's Harlem example, discussed above. See *supra*, at 28–29. The State could not then assert a partisan-gerrymandering defense, but it could invoke a host of other race-neutral justifications, like incumbency protection or district continuity, to ward off liability. In short, the majority's test fails to save Section 2 even for the "intra-party [racial] disparities" that the majority asserts Congress had in mind. *Ante*, at 27.

And more fundamentally, the majority is wrong on its history. By 1982 (the year of Section 2's amendment), Congress well knew that "race is often correlated with party preference," because that was increasingly the case. *Ibid.* Senate hearings were replete with testimony about that growing correlation, with opponents of the House's "results in" language (Senator Hatch and his camp) questioning witnesses about why "minority groups alone" should be "immune to partisan or ideological gerrymandering." Senate Report, at 184; see *id.*, at 172, n. 235; Hearings on S. 53 et al. before the Subcomm. on the Constitution of the S.

Comm. on the Judiciary, 97th Cong., 2d Sess., 649, 964–965, 1255, 1376–1377 (1982).  But those proponents of *Bolden*, of course, did not get their way: The Dole proposal maintained the House's emphasis on results, not motives.  See *supra*, at 14–15.  So the majority's appeal to an old "one-party system," *ante*, at 27, like the rest of its insistence on disentangling partisanship and race, works not to uphold but instead to overthrow the bargain Congress made.

The last argument about "post-*Gingles* development[s]" worth mentioning is also the most dispiriting.  *Ibid.*  Seven years ago, this Court held in *Rucho* v. *Common Cause*, 588 U. S. 684 (2019), that claims of political gerrymandering are not justiciable in federal court.  That was, in my view, an ill-considered decision, whose adverse effects have never been more obvious than today, as this country's two major parties compete in a race to the bottom.  But to its (modest) credit, the *Rucho* Court did not pretend that partisan gerrymanders were something in need of safeguarding.  To the contrary, the Court conceded that they were "incompatible with democratic principles" and "lead[] to results that reasonably seem unjust."  *Id.*, at 718.  (The Court's rationale was only that federal courts lack competence to deal with gerrymanders, not that they were protected by law or beneficial as policy.)  Today, though, the majority straight-facedly holds that the Voting Rights Act must be brought low to make the world safe for partisan gerrymanders.  See *ante*, at 27–28.  For how else, the majority reasons, can we preserve the authority of States to engage in this practice than by stripping minority citizens of their rights to an equal political process?  See *ibid.*  And with that, the majority as much as invites States to embark on a new round of partisan gerrymanders—and makes an already bad precedent into one still worse.  It is not enough that *Rucho* has harmed the whole body politic.  Now, that decision also becomes the cudgel to diminish the rightful voting influence of its minority citizens.

IV

Congress amended Section 2 to reverse this Court's decision in *Bolden* that the law barred only intentional racial discrimination in voting. Based on a century of history, Congress determined that such a limited ban would not be enough to protect minority citizens' voting rights. The legislation Congress enacted to correct *Bolden* emerged from vigorous debate and careful compromise, based mainly on this Court's decision in *White*. The new law denied a right to proportional representation; it focused instead on the "opportunity" that a given election practice granted minority citizens. But the requisite opportunity was not to be assessed by a State's intent or by its proffered justifications. Rather, the lawfulness of an election practice was to turn on its "results"—on whether it gave minority citizens a lesser chance than their majority neighbors to participate in politics and elect candidates. In making that choice, Congress exercised its constitutional responsibility to enforce the Fifteenth Amendment. And when called on to interpret the new law, this Court—from *Gingles* all the way through *Allen*—respected and implemented what Congress had done.

Today's majority does not. Its supposed "updating" of *Gingles* overthrows Congress's decision to make Section 2 liability hinge on an electoral practice's effects—on how it actually works. The new *Callais* requirements will effectively insulate any practice, including any districting scheme, said by a State to have any race-neutral justification. That justification can sound in traditional districting criteria, or else can sound in politics and partisanship. As to the latter, the State need do nothing more than announce a partisan gerrymander. Assuming the State has left behind no smoking-gun evidence of a race-based motive (an almost fanciful prospect), Section 2 will play no role. "Whatever"—*whatever*—results from the State's asserted justification is all its minority citizens are entitled to. *Ante*,

at 22. Even if the State has deprived those citizens (but not their majority neighbors) of all opportunity to "elect representatives of their choice," the law will not protect them. §10301(b). It is *Bolden* redux, despite Congress's repudiation of that decision (and this Court's precedents honoring that rejection). The majority has made its own assessment of current needs, see *ante*, at 26–28, and concluded that preventing racial vote dilution does not count among them. So once again, "in the absence of proof of intentional discrimination," the right to vote gives minority citizens "nothing more than the right to cast meaningless ballots." *Bolden*, 446 U. S., at 104 (Marshall, J., dissenting).

The consequences are likely to be far-reaching and grave. Today's decision renders Section 2 all but a dead letter. In the States where that law continues to matter—the States still marked by residential segregation and racially polarized voting—minority voters can now be cracked out of the electoral process. The decision here is about Louisiana's District 6. But so too it is about Louisiana's District 2. See *supra*, at 33–34. And so too it is about the many other districts, particularly in the South, that in the last half-century have given minority citizens, and particularly African Americans, a meaningful political voice. After today, those districts exist only on sufferance, and probably not for long. If other States follow Louisiana's lead, the minority citizens residing there will no longer have an equal opportunity to elect candidates of their choice. And minority representation in government institutions will sharply decline. At the first stage of this judicial project to destroy the Voting Rights Act, the Court maintained that Section 5 was no longer needed because in recent decades "African-Americans attained political office in record numbers." *Shelby County*, 570 U. S., at 553; see *id.*, at 549. At this last stage, the Court's gutting of Section 2 puts that achievement in peril. I dissent because Congress elected otherwise. I dissent because the Court betrays its duty to faithfully

implement the great statute Congress wrote. I dissent because the Court's decision will set back the foundational right Congress granted of racial equality in electoral opportunity. I dissent.